**UNPUBLISHED ORDER**
Not to be cited per Circuit Rule 53

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois  60604**

Argued November 2, 2005
Decided March 29, 2006

**Before**

Hon. JOHN L. COFFEY, *Circuit Judge*

Hon. FRANK H. EASTERBROOK, *Circuit Judge*

Hon. ANN CLAIRE WILLIAMS, *Circuit Judge*

No. 04-3942

| | |
|---|---|
| MEHRIBAN YAYLACICEGI, UMIT YAYLACICEGI and ELIF YAYLACICEGI, | Petition for Review of an Order of the Board of Immigration Appeals |
| *Petitioners*, | No. A79-587-634 |
| | No. A79-587-633 |
| *v.* | No. A79-587-632 |
| ALBERTO R. GONZALES, | |
| *Respondent*. | |

## O R D E R

Mehriban Yaylacicegi, her husband Umit, and her daughter Elif, immigrants from Turkey, applied for asylum based on persecution that Mehriban allegedly suffered at the hands of her religiously fundamentalist family.  An immigration judge denied their application, finding that she had neither suffered past persecution nor shown an objectively reasonable fear of future persecution.  Because substantial deference is due the IJ's findings, we deny the petition for review.

# I. Background

At the Yaylacicegis' asylum hearing, Mehriban testified that she was born in Istanbul, Turkey, to a strictly fundamentalist Muslim family. After her father's death, her two older brothers, Ibrahim and Coskun Cabuk, became the de facto heads of the family and imposed a strict code of conduct on her in accordance with their religious beliefs. Mehriban testified that the brothers required her to wear traditional concealing clothing, such as a scarf covering her head; refused to let her leave the house without permission or an escort; forbade her to use the telephone without their permission; prevented her from seeking employment; and controlled her vote once she reached voting age.

Mehriban testified to a particular violent incident that occurred when she was 20 years old and a student at a university that was a 20-hour drive from her family home in Istanbul. During a semester break, while visiting her family, Mehriban used the telephone without her brothers' permission. One of her brothers discovered her on the phone and assumed that she was speaking to a man. He seized the telephone and attacked Mehriban with a knife, cutting her left hand. The injury required stitches, and left visible scars.

Mehriban's decision to marry Umit Yaylacicegi also angered her brothers because, according to her, his parents were "modern" and he did not share their conservative values. The brothers tried to prevent the marriage by sequestering Mehriban in the family home for three weeks and beating her. Mehriban and Umit eventually eloped, but attempted to keep their address and telephone number private so that her brothers would not be able to find them. Umit Yaylacicegi testified that her brothers came to his house on their wedding day searching for her. Afterwards, Umit's father called the Cabuk brothers and told them that Umit, as Mehriban's husband, was now head of her family and was responsible for making decisions for her. As a result, the brothers "back[ed] off and stopped searching" for her, for an indeterminate period of time.

The brothers' concession did not last. Mehriban testified that after her daughter was born, her mother asked to meet with Mehriban and her grandchild. Mehriban agreed to see her mother at her sister's home. She arrived dressed in "regular clothes," apparently meaning that she was not wearing the head covering or head-to-toe clothing her fundamentalist family had required her to wear. Her mother and sister were hostile to Mehriban's appearance and "rejected" her. Mehriban's brothers soon arrived, and according to her testimony beat and kicked her, continuing to batter her after she had fallen to the ground. Umit testified that Mehriban's sister called him to pick her up from the meeting, and that when he arrived, Mehriban was sitting outside the house waiting for him, injured and unable to move. Mehriban was diagnosed with a herniated disk in her spine, and

testified that her physician advised a month of bed rest and prescribed medication for her after the beating. Umit added that she could not move or speak for some time after the attack.

After the beating, Mehriban's brothers obtained her telephone number and began calling and threatening her "frequently." Mehriban said that she was afraid her brothers would harm her or her family, and that the Turkish police were unable or unwilling to help women in her situation. Approximately five months later, Mehriban came to the United States on a visitor's visa, which she overstayed. Subsequently, the Yaylacicegis began attending a nondenominational Christian church, and Mehriban was baptized several months before her asylum hearing.

At the hearing, the Yaylacicegis testified about the abuse Mehriban had suffered in Turkey as well as what they feared would happen if she returned there. In particular, Mehriban expressed fear that she would be killed, both because of her refusal to abide by her brothers' religious beliefs and her subsequent conversion to Christianity. The Yaylacicegis presented an expert witness to support this claim, Charles MacDonald, a professor at Florida International University specializing in international law and Middle Eastern affairs, including human rights in Turkey. MacDonald testified about the prevalence of honor killings and influence of fundamentalist Islamic politics in Turkey. He noted that the Cabuk brothers allegedly belong to the Saadat Party, a legal but fringe fundamentalist Islamic party. MacDonald characterized Saadat as one of the more radical fundamentalist Islamic parties in Turkey. When asked what Mehriban's brothers would do if she were to return to Turkey, MacDonald replied, "Well, they would, in my view, kill her." He explained that he thought that the police often "look the other way," and that prison terms handed down for honor killings are often "very, very lenient or nonexistent."

The IJ denied the Yaylacicegi's application. The IJ found the applicants credible, but ruled that the two attacks on Mehriban by her brothers did not rise to the level of past persecution. "Regrettably," the IJ concluded, "persecution within the Immigration and Nationality Act does not contemplate all treatment that society regards as unjust." As for a fear of future persecution, the IJ said that the State Department's 2002 Report on Human Rights Practices contradicted the applicants' testimony that they could not obtain protection from the Turkish civil authorities. The IJ also found that she had not shown that the abuse she feared was on account of her religion, political opinion, or membership in a particular social group. In addition, the IJ pointed out that Mehriban was persecuted by her brothers, not agents of the government or parties that the government was unwilling or unable to control; the IJ took note of the fact that the Yaylacicegis never sought police protection in Turkey. Finally, taking note of the "large

Christian community" in Turkey, the IJ held that the Yaylacicegis "would most likely be able to practice their Christian faith in that country if returned to Turkey."

The BIA affirmed and adopted the IJ's decision in all respects except one. The BIA disagreed with the IJ only in that it found that Mehriban's "difficulties" were "on account of her religion." The only other issues addressed by the BIA were Mehriban's argument that the IJ mischaracterized Professor MacDonald's expert testimony, and that the interpreter at the asylum hearing rendered inaccurate translations of her testimony. The BIA found that the IJ's summary of MacDonald's testimony was accurate, and that without citing any specific mistranslations, had not demonstrated "any error or prejudice" arising from any faulty translation at the hearing.

## II. Analysis

The petitioners suggest that the Board's finding that Mehriban's "difficulties" were "on account of her religion" should have compelled a finding that she suffered past persecution. We are not persuaded. While any alleged persecution must be on account of one of the factors of 8 U.S.C. § 1101(a)(42)(a), including religion, in order to qualify the petitioners as refugees, not all "difficulties" predicated on the victim's religion rise to the level of persecution. *See Capric v. Ashcroft*, 355 F.3d 1075, 1084 (7th Cir. 2004). Nor do the petitioners explain the Turkish government's connection to their alleged persecution; persecution "is something a government does, either directly or by abetting (and thus becoming responsible for) private discrimination by throwing in its lot with the deeds or by providing protection so ineffectual that it becomes a sensible inference that the government sponsors the misconduct." *Hor v. Gonzales*, 400 F.3d 482, 485 (7th Cir. 2005). The IJ found that the petitioners had not shown that the Turkish government was unwilling or unable to protect them, and the Yaylacicegis do not show how that finding is erroneous.

The Yaylacicegis' best evidence that the government would not or could not protect them if they were to return to Turkey is Professor MacDonald's testimony that "the police would essentially not become involved" in affairs within a conservative Islamic family such as the Cabuks, and that the penalties for violence within an Islamic family would be lenient or nonexistent. He also testified, however, that the government's indifference would not extend to violence that spilled over into the non-Islamic community, which would include the now-Christian Yaylacicegis. The IJ was entitled to credit this testimony, as well as contemporary State Department reports on human rights and religious freedoms, as directly contradicting Mehriban's "assertions that she would be afforded no protection by the government of Turkey if she were returned to her country." The IJ's determination that Mehriban neither suffered past persecution nor had an objectively reasonable fear of future persecution is supported by "reasonable,

substantial, and probative evidence on the record considered as a whole." *Georgis v. Ashcroft*, 328 F.3d 962, 967 (7th Cir. 2003).

The Yaylacicegis also argue that the IJ mischaracterized the evidence presented at the asylum hearing, especially Professor MacDonald's testimony. The petitioners assert that the IJ's summary of his testimony is misleading and inaccurate because it implies that the government would intervene on Mehriban's behalf if it were made aware of her brothers' involvement with Saadat. For instance, Professor MacDonald testified that the Turkish military might be monitoring Mehriban's brothers if they had been involved in pro-Iranian demonstrations. Petitioners contend that the IJ characterized this testimony as an admission that the government would protect Mehriban because of her brothers' politics.

But even if the petitioners are correct and the IJ did mischaracterize one part of Professor MacDonald's presentation, the IJ understood the testimony and accurately summarized his opinion that the government would be unwilling or unable to protect Mehriban against an honor killing: "Professor MacDonald indicated that he does not believe that Mehriban would receive much in the way of protection from the Turkish government because they do not aggressively pursue such cases, sometimes treating them as family matters." Nor do petitioners show how the IJ's summary of the testimony prejudiced their case, which we have held is necessary to prevail in due process claims. *See, e.g., Hussein v. Gonzales*, 424 F.3d 622, 626 (7th Cir. 2005) ("to prevail on a due process claim, an alien must show prejudice"), *citing Capric v. Ashcroft*, 355 F.3d 1075, 1088 (7th Cir. 2004).

The petitioners also contend that the IJ mischaracterized the extent of Mehriban's injuries, but this is not relevant; the question here is not the extent of injuries received from private parties, but rather whether the harm was inflicted by the government, or by private parties that the government is unable or unwilling to control. *Hor*, 400 F.3d at 485. In any event, the IJ's summary of Mehriban's injuries appears to be largely accurate.

Finally, the petitioners contend that the interpreter at the asylum hearing was incompetent to render accurate and fluent translations of the questioning in English and the Turkish responses. The petitioners do not identify any particular mistranslation, but point to the translator's "sentence structure" as a signal that he was "not up to snuff as an English speaker." This court has held that such a claim "founders on [a petitioner's] inability to demonstrate either that the translation was actually flawed or that he was prejudiced by the allegedly ineffective translation." *Kuqo v. Ashcroft*, 391 F.3d 856, 858 (7th Cir. 2004). The petition for review is DENIED.