In the

# United States Court of Appeals
## For the Seventh Circuit

No. 06-2015

IRENE ARREY AGBOR and
TERRY AYUK ETTA AGBOR EBAI,

*Petitioners,*

*v.*

ALBERTO R. GONZALES,

*Respondent.*

Petition for Review of an Order of the
Board of Immigration Appeals.
Nos. A95-600-264 & A95-600-265.

ARGUED JANUARY 23, 2007—DECIDED MAY 25, 2007

Before FLAUM, KANNE, and WILLIAMS, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* Soon after getting married, the petitioners fled their home country of Cameroon and sought asylum in the United States because the bride's mother insisted—to the point of death threats—that the bride be circumcised. Irene Agbor refused, calling the process of female circumcision "a violent ritual mutilation of the female genitalia." Her husband, Terry A.E. Agbor Ebai, agreed and opposed the practice. But an immigration judge, relying on general country report information suggesting that female circumcision is not ubiquitous in Cameroon, concluded that their fears of future persecution were unreasonable. The Board of Immigration Appeals

affirmed in a separate opinion, and this petition for review followed. Both the IJ and the BIA disregarded critical evidence in the petitioners' favor, and their reasons for discounting the petitioners' fears are problematic. We therefore vacate the underlying decision and remand for further proceedings consistent with this opinion.

## I.  BACKGROUND

We draw upon the petitioners' asylum application and testimony at an immigration hearing in relaying these background facts.[1] Agbor and Ebai were married in the summer of 2001 in a traditional Cameroonian ceremony. Agbor was 25 years old at the time. Shortly after the wedding, Agbor traveled from her new town of Mamfe to visit her parents in their village, Dequa. (Both Mamfe and Dequa are in the Southwest Province of Cameroon.) Her mother told her that it was time "to do their tradition"—in other words, circumcision, which in the west is commonly referred to as female genital mutilation (FGM).[2]

---

[1]  The IJ did not make an adverse credibility finding against the petitioners.

[2]  We have described FGM as a "horrifically brutal procedure" in which some or all of the exterior female genitalia is removed. It is usually performed without anesthesia and using unsterile and rudimentary instruments such as razor blades, knives, or broken glass. *See Nwaokolo v. INS*, 314 F.3d 303, 308-09 (7th Cir. 2002) (per curiam). Because of its profound traumatic effects—including severe pain, shock, urine retention, hemorrhage and infection (potentially leading to death), sexual dysfunction, and infertility—FGM has been roundly condemned by the international community. *See Olowo v. Ashcroft*, 368 F.3d 692, 702 (7th Cir. 2004). It is also prohibited by federal law, 18 U.S.C. § 116, and by the laws of two of the three states in this
(continued...)

Agbor did not want to be circumcised, so she stalled for time, saying she would need to talk to her husband first. When she returned home, Ebai rejected the idea of circumcision as well, saying he "would not accept the situation."

When Agbor and Ebai did not follow up with Agbor's mother, both her parents paid the couple a visit in Mamfe, again insisting that "in our tradition when a girl gets married she must be circumcised." After arguing the matter for several hours, Agbor's parents left. They returned a few weeks later accompanied by a witch doctor. This caught the young couple's attention—Agbor testified that a witch doctor had killed several members of her village by poison—but Ebai was able to forestall a decision by saying they would wait until after they registered their marriage. Two weeks after they did so, Agbor's parents returned and made an ultimatum: if Agbor refused to be circumcised, they would again bring the witch doctor, who would poison them, killing Ebai and rendering Agbor infertile. At this point the petitioners sought the aid of the local police. As Agbor testified in response to a question whether she sought help from the government: "Yes sir. I went to the police. The police said it is our—they don't want to intervent [sic] to our tradition. That is our culture that is going on. They don't want to intervent [sic]." Indeed, the police refused even to fill out a police report on their behalf. Agbor also testified that the government has not wiped out the practice of FGM, which is common in some areas, saying, "they don't do anything to stop it."

True to their word, Agbor's parents returned after a few weeks with the witch doctor in full regalia. The spectacle

---

[2] (...continued)
judicial circuit, 720 Ill. Comp. Stat. 5/12-34 (2007); Wis. Stat. § 146.35 (2007).

drew a crowd, and Agbor and Ebai used the commotion to escape, taking all their spare cash with them. They traveled seven to eight hours by car to stay with a Mr. Daniel, an acquaintance of Ebai's from the business community. (Both men were involved in grocery-store supply, although they were not business partners.) Daniel had read about the petitioners' story in a Cameroonian newspaper called *The Herald*; the article, entitled "Couple flees from female circumcision to an unknown destination," was introduced into the record. For $1,000 apiece, Daniel provided them with passports and airplane tickets to the United States.

After they filed for asylum, an immigration hearing was held at which both petitioners testified. They also introduced written evidence: a series of human rights reports from various organizations; a doctor's slip confirming that Agbor has not been circumcised; letters from Agbor's brother and sister and from a friend congratulating her on her escape to America; and a letter from an American social worker who grew up in Cameroon and confirmed the common practice of FGM in Agbor's tribe.

The immigration judge's written decision denying asylum and other relief references none of these materials, except to quote selectively from the human rights reports and to question the validity of the newspaper article because it contained a typo and some infelicitous writing. The IJ rejected the asylum claim for several reasons. First, she held that the petitioners failed to show that the government had condoned FGM, noting instead that reports indicate that the government supports various NGOs' efforts to eradicate the practice. Second, the reports indicate that in Cameroon, FGM is usually practiced on young girls, not women of marrying age, and on Muslims, not Christians like Agbor. Third, the IJ viewed Agbor as having contradicted herself by saying on the one hand that she had witnessed her sister's

circumcision, and on the other that she had never heard of FGM until her mother approached her after the wedding. And fourth, the IJ questioned whether the couple could safely relocate to another part of Cameroon.

The BIA affirmed in a separate opinion. It focused solely on three points: FGM is not widespread in Cameroon; it is usually practiced on young girls and Muslims rather than adults and Christians; and "the government has taken steps to combat" the practice, making "concrete and strong efforts" in its anti-FGM campaign.

## II.  ANALYSIS

Where, as here, the BIA issues its decision in a separate opinion, we review that decision, rather than the IJ's. *Awe v. Ashcroft*, 324 F.3d 509, 512 (7th Cir. 2003). And our review is deferential: if reasonable, substantial, and probative evidence supports the decision, we must affirm it. *See Sina v. Gonzales*, 476 F.3d 459, 461 (7th Cir. 2007). The administrative findings of fact made below are conclusive unless any reasonable adjudicator would be compelled to conclude otherwise. 8 U.S.C. § 1252(b)(4)(B); *Gomes v. Gonzales*, 473 F.3d 746, 752 (7th Cir. 2007).

Under the familiar standard, a petitioner may demonstrate that she is a refugee, and hence eligible for asylum, by showing that she is unable or unwilling to return to her home country because of persecution or a well-founded fear of future persecution on account of certain specified factors, such as membership of a social group. 8 U.S.C. §§ 1101(a)(42)(A), 1158(b)(1)(A); *Gomes*, 473 F.3d at 753. The case law is quite clear that women who fear being circumcised should they return to their home countries are members of a discrete social group for purposes of the statute. *In re Kasinga*, 21 I. & N. Dec. 357, 365-66 (BIA 1996); *see Uanreroro v. Gonzales*, 443 F.3d 1197, 1202

(10th Cir. 2006); *Balogun v. Ashcroft*, 374 F.3d 492, 499 (7th Cir. 2004); *Abay v. Ashcroft*, 368 F.3d 634, 638 (6th Cir. 2004).

The parties and the BIA analyzed both whether Agbor suffered past persecution and whether she has a well-founded fear of future persecution. Since she has not yet been circumcised, but rather bases her claim on a fear that she will be circumcised if returned, we think that the matter is more appropriately analyzed as a claim of a fear of future persecution. *Compare Mohammed v. Gonzales*, 400 F.3d 785, 796-97 (9th Cir. 2005) (holding that individual who had been circumcised had shown past persecution). To succeed, Agbor and Ebai must therefore show that they subjectively fear returning to Cameroon, and that that fear is objectively reasonable. *See Boci v. Gonzales*, 473 F.3d 762, 766 (7th Cir. 2007). The BIA's three reasons for concluding that the petitioners' fear is objectively unreasonable do not withstand scrutiny.

The BIA's first reason, that FGM is not widely practiced in Cameroon, is true as far as it goes, but it is also incomplete—misleadingly so. The most recent State Department Country Report, of which we may take notice, *Giday v. Gonzales*, 434 F.3d 543, 556 n.6 (7th Cir. 2006), makes the same point, but immediately goes on to say that FGM continues to be practiced in three of the country's ten provinces, including the Southwest Province, which is where the petitioners live. *See* U.S. Dep't of State, Country Reports on Human Rights Practices (2006). This is consistent with Agbor's testimony that the women in her village all undergo circumcision. The report also states that in parts of the Southwest Province, FGM is still common in its most brutal form, infibulation. *Id.*[3] We

---

[3] The Female Genital Cutting Education and Networking Project explains that infibulation

(continued...)

have emphasized before that the most probative evidence regarding the prevalence of FGM is region-specific, rather than country-wide, because "the incidence of FGM often varies significantly from state to state." *See Balogun*, 374 F.3d at 507. By favoring the general (Cameroon) over the specific (Southwest Province), the BIA disregarded this admonition. The government also notes, as did the IJ, that some sources, while acknowledging that no reliable figures exist, put the rate of FGM among Cameroonian women at around 3%. Again, this matters little if the rate in the petitioner's community is high. *See* C. Effiom & S. Bille, "FGM in Cameroon," 17 Inter-African Comm. on Traditional Practices Affecting the Health of Women and Children Newsletter 16 (1995) (stating that rate of FGM in Southwest Province is 40%). Nevertheless, other reputable sources say the number of Cameroonian women affected by FGM may be as high as 20%. *See* Admin. R. 167, 258. In either case, in a country of over 18 million people (and roughly 9 million women), these are not trifling numbers: 270,000 women at the lowest, and 1.8 million at the highest. We note that the latter figure exceeds the number of women presently living in the city of Chicago.

The BIA next stated that FGM in Cameroon "is usually performed on infant and pre-pubescent girls, not married adult women," and that "it is mainly practiced among Muslims." It is true that the State Department report

---

[3] (...continued)
   consists of the removal of the clitoris, the adjacent labia (majora and minora), and the joining of the scraped sides of the vulva across the vagina, where they are secured with thorns or sewn with catgut or thread. A small opening is kept to allow passage of urine and menstrual blood.

*See* http://www.fgmnetwork.org/intro/fgmintro.php.

says that "FGM usually was practiced on infants and preadolescent girls." State Dep't Report (2006). But the BIA seemed to think that "usually" means "exclusively," which it does not. Indeed, although case law on FGM in Cameroon is sparse, courts have noted that variation among tribes and villages is an abiding feature of the practice in sub-Saharan Africa. *See Haoua v. Gonzales*, 472 F.3d 227, 229-30 (4th Cir. 2007) (involving a village in Niger, which borders Cameroon by lake, in which FGM is practiced at the time of marriage)*; Uanreroro*, 443 F.3d at 1207; *Abebe v. Gonzales*, 432 F.3d 1037, 1043 (9th Cir. 2005); *Nwaokolo*, 314 F.3d at 308 (noting that in Nigeria, which shares a border with Cameroon, women are subjected to FGM "anytime from a few days after birth to a few days after death"). A quick citation to the "usually" language in the report is insufficient to undermine the petitioners' extensive and consistent testimony that Agbor was pressed to undergo circumcision after her wedding.

As to the religious aspect of FGM, the BIA is simply incorrect in saying that it "is mainly practiced among Muslims" in Cameroon. A report in the record by the Immigration and Refugee Board of Canada notes that in the regions where FGM is common, such as the Southwest Province, it affects 100% of Muslim women and 63% of Christian women—and there are twice as many Christians as Muslims in Cameroon. *See* Admin. R. at 167; CIA World Factbook, https://www.cia.gov/cia/publications/fact book/geos/cm.html. Again, these are not negligible figures. If this background information were not enough to corroborate the petitioners' narrative, there were also the letters from the petitioners' family and friends—and, critically, the letter from a social worker who grew up in Cameroon and specifically verified that FGM is common in the petitioners' tribe. *See Abankwah v. INS*, 185 F.3d 18, 25-26 (2d Cir. 1999) (placing significant weight on affidavit of naturalized citizen from Ghana familiar with

practice of FGM in that country). The BIA ignored this evidence, and that is something it is not permitted to do. *See Diallo v. Ashcroft*, 381 F.3d 687, 695 (7th Cir. 2004).

The last point relied on by the BIA is that the government of Cameroon officially opposes FGM and has publicly endorsed the efforts of NGOs working to end the practice. But the BIA may not simply seize on a few "flowery bromides" of governmental concern over human rights violations when the remainder of the report describes incidents of persecution consistent with a petitioner's claim. *See Dawoud v. Gonzales*, 424 F.3d 608, 611 (7th Cir. 2005). After noting the Cameroonian government's general opposition to FGM, the State Department report indicates that FGM is commonly performed in some parts of Cameroon, and that there are no laws or policies outlawing the practice. Indeed, we notice that from 1997, when the Cameroonian government initiated a campaign to eradicate FGM within 15 to 20 years, to 2006, when the most recent State Department report was issued, the U.S. government's description of the practice's prevalence in Cameroon has not changed appreciably. *Compare* State Dep't Report (2006) *with* U.S. Dep't of State, Profile of Asylum Claims and Country Conditions (1998). Moreover, whatever the government's general position, it does not change the fact that Agbor and Ebai went to the authorities for help and were turned away because the police did not want to interfere in tribal affairs. We do not think that as soon as a government pledges to end a persecutory practice, the individuals still suffering from the vestiges of that practice automatically cease to be entitled to protection.

On the whole, the BIA's decision is not supported by substantial evidence and must be vacated. The BIA disregarded key evidence that is specific to the petitioners' case, relied on background evidence that is only generally to the contrary, and then faulted the petitioners

for failing to offer specific evidence overcoming the back-
ground evidence. This type of analysis cannot withstand
even deferential judicial review.[4]

In addition, the government relies heavily on the IJ's
analysis in its brief, so we pause to note a few points
in order to facilitate matters on remand. First, the gov-
ernment, like the IJ, argues that Agbor testified inconsis-
tently, saying early on that she witnessed her sister's
circumcision, but later saying that she had never heard of
the practice until her mother confronted her after her
own wedding. Agbor did not, however, testify that she
had never heard of FGM until her wedding, but rather that
the practice was not openly discussed:

> Q: How many times did you argue against this prac-
> tice prior to your marriage?
>
> A: They, they didn't tell me before I got married. It's
> something like—I tell you it's like it's taboo that
> you don't explain it to somebody until when it's
> taking place to you. Like if they do it to me, I can't
> say to anybody. I don't tell anybody because it's
> like taboo until wedding. That's my—to your own
> self.
>
> Q: Now you say—before you were—you're saying
> women do not discuss this among themselves.
>
> A: Yeah, they don't discuss except if like my sister
> can tell me that they did it to me when I was—
> I just got married. They did it to me. It's some-
> thing that is like it's taboo they do it all over
> where I come from.

---

[4] The petitioners also raise several due process challenges to
the manner in which the IJ conducted the immigration proceed-
ings. Because we reverse on the substance of the asylum claim,
we need not reach these arguments.

Here, Agbor seems to be saying that the reason she did not speak out against FGM was because it was taboo to discuss it, not that she had never heard of the practice before her mother confronted her. In fact, Agbor could not have been saying that she had never heard of FGM before her wedding because she mentions that her sister had earlier told her that she had been circumcised. Moreover, the fact that Agbor indicated in her affidavit that she was shocked when her mother approached her seems to have more to do with finally confronting an unspeakable practice than learning about something for the first time.

A second point relied upon by the IJ and the government which we take a moment to discuss is the alleged implausibility that the petitioners only know Mr. Daniel—the man who provided them shelter and passports—by his first name. Ebai testified that he and Daniel were mere acquaintances from the business community rather than close associates or friends, and Agbor stated that in Cameroon it is customary only to know and refer to an acquaintance by his first rather than his full name. The IJ did not mention these explanations. *See Uwase v. Ashcroft*, 349 F.3d 1039, 1043 (7th Cir. 2003) (IJ must explore explanation for implausible or inconsistent testimony).

Third and lastly, the IJ tersely stated that the petitioners had failed to demonstrate that they could not safely relocate to another part of Cameroon, noting that it is a large country. It is true that Agbor and Ebai bear the burden of showing that they cannot relocate, 8 C.F.R. § 208.13(b)(3)(I), and they may or may not ultimately meet that burden. But one of the letters of support they introduced discussed Agbor's mother's attempts to find them when they fled, and the IJ did not discuss this evidence. Moreover, we do not think the standard for relocation can be as high as the government suggests when it says that Agbor and her husband could "avoid

being found by members of her tribe." Relocating to another part of the country does not mean living in hiding; if Agbor's mother refuses to take no for an answer and tries to poison the petitioners wherever they are in Cameroon, they cannot be said to have relocated safely. *See Tapiero de Orejuela v. Gonzales*, 423 F.3d 666, 674 (7th Cir. 2005).

### III.  CONCLUSION

For the foregoing reasons, we VACATE the BIA's decision denying asylum and other relief and REMAND for further proceedings.

A true Copy:

Teste:

_____

*Clerk of the United States Court of Appeals for the Seventh Circuit*