In the

# United States Court of Appeals

## For the Seventh Circuit

No. 10-2899

SAAD SARHAN and SARA ISSA MOHAMAD DISI,

*Petitioners,*

*v.*

ERIC H. HOLDER, JR., Attorney General
of the United States,

*Respondent.*

Petitions for Review from an Order
of the Board of Immigration Appeals.
Nos. A 076 766 381, A 076 766 390

ARGUED APRIL 13, 2011—DECIDED SEPTEMBER 2, 2011

Before POSNER, WOOD, and TINDER, *Circuit Judges.*

WOOD, *Circuit Judge.* This petition presents the question whether a woman who will fall victim to an "honor killing" at the hands of a family member is entitled to relief either under the Convention Against Torture (CAT) or under the procedure known as "withholding of removal." For the latter, she must prove

that she is a member of a "particular social group" within the meaning of the Immigration and Nationality Act (INA), 8 U.S.C. § 1231(b)(3). We hold that she has successfully established that she is. In addition, for purposes of both the CAT and withholding, we find that the decision of the Board of Immigration Appeals (the Board) finding that she has not shown a clear probability that she will be killed on account of her membership in that social group if she is returned to Jordan is not supported by substantial evidence. The Board failed to consider significant evidence that she presented that supports a finding that the Jordanian government is currently unable or unwilling to protect her. The relief requested by her husband, who is the other petitioner, is an issue that the Board of Immigration Appeals must reconsider in the first instance. We grant the petitions for review and remand to the Board for further proceedings consistent with this opinion.

## I

Saad and Sara Sarhan, a married couple who are citizens of Jordan, received visitor visas and came to the United States with their two children in the 1990s. (Sara also goes by Sara Issa Mohamad Disi; we refer to her as Disi in the interest of keeping the parties straight.) Shortly after they arrived, Disi gave birth to a third child. The Sarhans' new daughter had kidney problems, and so the family stayed in the United States beyond the expiration of the parents' visas to ensure that the child received the care she needed. They settled in Chicago, and eventually the couple had two more children.

Nuha Sarhan is Sarhan and Disi's sister-in-law (she is married to Sarhan's brother). There is a history of animosity between Nuha and her in-laws. Disi is convinced that it was Nuha who triggered the current proceedings by revealing to the immigration officials that Disi and Sarhan were in the United States illegally. Before Nuha did that, however, she started a rumor that Disi had committed adultery. Nuha told this story to her mother, who took the news to Amman, Jordan, and there informed Disi's family—including Disi's brother, Besem Disi—that Disi had been unfaithful and had dishonored the family. Disi first heard about these false accusations in 2003, when Sarhan's parents visited the United States and told her that these rumors were swirling in Jordan. Neither Sarhan nor the rest of his family believe that anything Nuha has said is true, but Disi's brother Besem is convinced that Disi has committed adultery and has ruined the family's reputation. Sarhan's parents told Disi during their visit that Besem planned to kill her when she returned to Jordan in order to restore the family's honor.

"Honor killings" (an oxymoron if we ever heard one) happen "when a family feels that their female relative has tarnished their reputation by what they loosely term 'immoral behavior.' The person chosen by the family to carry out the murder (usually male: a brother, father, cousin, paternal uncle or husband) brutally ends their female relative's life to cleanse the family of the 'shame' she brought upon them." RANA HUSSEINI, MURDER IN THE NAME OF HONOUR xi (2009). See generally *Islamic 'Honor' Killings in Jordan,*

http://www.youtube.com/watch?v=iVRvQtGTv-s (CNN report available on YouTube). Such killings are commonplace around the world and typically happen in countries where the moral code tightly restricts the behavior of women; government offers little protection for the victims; and killers receive light punishment, if charges are not dropped altogether.

Besem has long been obsessed with family honor, as defined by religious and social norms in Jordan, and he cannot be deterred from murdering his sister in response to the rumors Nuha started. Besem's persistence is perplexing given the evidence that Nuha has manufactured scandals similar to this one in the past. Before sullying Disi's name, Nuha once accused Sarhan's mother (her own mother-in-law) of infidelity; this slur caused Sarhan's father to attempt an honor killing against his wife. Thankfully, Sarhan and his brothers intervened to save their mother's life, and the family later discovered that Nuha had made the whole thing up. Nonetheless, Besem is resolute, because he apparently believes that the rumors alone have harmed his reputation in the community enough to warrant killing Disi—the truth no longer matters. In 2006, Besem visited Disi in Chicago and told her that he planned to murder her when she returned to Jordan. In the proceedings in the Immigration Court, Disi testified that Besem said, "[W]hen you come back to Jordan, I'm going to kill you. Here [in the United States], I can't do, because there is a penalty for this, but in Jordan, nobody can do for another killing." Sarhan and his father have corroborated the sincerity of Besem's threat.

The Sarhans appeared in Immigration Court on January 17, 2006, and conceded that they were removable because they had overstayed their visas. They filed applications for asylum and withholding of removal and requested relief under the CAT based on Besem's death threat. (More formally, the CAT is the United Nations Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, New York, December 10, 1984. See http://untreaty.un.org/cod/avl/ha/catcidtp/catcidtp.html. By virtue of Pub. L. No. 105-277, 112 Stat. 2681-821, it is part of U.S. law.) Sarhan and the Sarhans' two children who are not U.S. citizens are listed as beneficiaries on Disi's application. After hearing testimony that included the details we have just recounted, Immigration Judge Zerbe (the IJ) denied all relief (except for voluntary departure, which is not relevant here) and ordered the Sarhans removed to Jordan. The IJ denied the Sarhans' application for asylum as untimely because it had been filed more than a year after they arrived in the United States. In the IJ's view, they had not shown changed circumstances or any other acceptable reason for the delay. See 8 U.S.C. § 1158(a)(2)(B) & (D). With respect to withholding of removal, the IJ denied relief for a number of reasons: while Judge Zerbe found that the petitioners had testified credibly about Besem's plans to kill Disi, he concluded that this was not enough to demonstrate that Besem posed a continuing threat to Disi; he also ruled that Disi was not a member of a particular social group and that, even if she was, she had not shown that Besem intended to kill her on account of her membership in

that group. After reviewing evidence about honor killings in Jordan, the IJ drew the conclusion that Jordan would protect Disi even if Besem did pose a threat. Finally, if all other reasons to deny relief failed, the IJ added that he saw no reason that Disi could not relocate to avoid the threat once she arrived in Jordan. The IJ denied relief under the CAT for similar reasons. The Board affirmed in a two-page opinion, and the Sarhans filed these petitions.

## II

The Sarhans have focused on the Board's denial of withholding of removal in their petitions for review. As they recognize, we lack jurisdiction to review its conclusion that their application for asylum was untimely and not excused by extraordinary circumstances. *Restrepo v. Holder*, 610 F.3d 962, 964 (7th Cir. 2010). Although they have not made any points particular to the CAT in the brief before this court, the Board ruled on the merits of the CAT claim, and the government has conceded that both the withholding claim and the CAT claim are before this court. Brief for United States at 10 n.4. Our discussion below applies for the most part to both theories, but they differ in some important respects, as we note.

Before proceeding, it is helpful to clarify what decision we are reviewing and what standards apply. The parties dispute whether we should review the Board's opinion alone or the IJ's decision as supplemented by the Board.

The government argues for the latter approach, and we agree with its position. The Board did not supply an opinion independent of the IJ's decision in this case, *e.g.*, *Liu v. Ashcroft*, 380 F.3d 307, 311 (7th Cir. 2004); nor did it expressly adopt the IJ's analysis in its entirety, *e.g.*, *Pop v. INS*, 270 F.3d 527, 529 (7th Cir. 2001). Instead, the Board agreed with the IJ and supplemented his opinion with additional observations of its own. When this happens, we review the IJ's decision wherever the Board has not supplanted it with its own rationale; where the Board has spoken, we review its opinion. *Mema v. Gonzales*, 474 F.3d 412, 416 (7th Cir. 2007). The agency's factual findings related to the petitioners' claims must be supported by substantial evidence. *Feto v. Gonzales*, 433 F.3d 907, 910-11 (7th Cir. 2006). We review its legal conclusions *de novo*, *Ahmed v. Ashcroft*, 348 F.3d 611, 615 (7th Cir. 2003). Finally, our review is constrained by the agency's reasoning: we may uphold its conclusion only on a basis that was articulated by the agency itself. *Moab v. Gonzales*, 500 F.3d 656, 659 (7th Cir. 2007).

### III

#### A

Withholding of removal is mandatory under the INA if an applicant establishes that it is more likely than not that she would be persecuted in the country of removal "because of [her] race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3); see also *Benitez Ramos v.*

*Holder*, 589 F.3d 426, 430-31 (7th Cir. 2009). The require-
ments for obtaining relief under the CAT are also
stringent, but they differ in some respects from those
for withholding. "To obtain protection under CAT, one
must show that 'it is more likely than not that one would
be tortured if removed to the proposed country of re-
moval.'" *Toure v. Holder,* 624 F.3d 422, 429 (7th Cir. 2010)
(quoting from *Rashiah v. Ashcroft,* 388 F.3d 1126, 1131
(7th Cir. 2004)). "Torture" for these purposes is defined as:

> any act by which severe pain or suffering, whether
> physical or mental, is intentionally inflicted on a
> person for such purposes as obtaining from him or
> her or a third person information or a confession,
> punishing him or her for an act he or she or a third
> person has committed or is suspected of having com-
> mitted, or intimidating or coercing him or her or a
> third person, or for any reason based on discrimina-
> tion of any kind, when such pain or suffering is in-
> flicted by or at the instigation of or with the consent
> or acquiescence of a public official or other person
> acting in an official capacity.

8 C.F.R. § 208.18. Unlike the remedy of withholding of
removal, relief under the CAT is not conditioned on
proof that the alien has been persecuted because of one
of the five grounds listed in the INA. On the other hand,
the need to prove "torture," as so defined, sets a high
bar for relief. Relief under both the CAT and the with-
holding provisions requires the applicant to prove that
it is "more likely than not" that the adverse consequences
will occur if she is returned to the country in question.

Focusing first on withholding of removal, the IJ rejected Disi's argument that she was a member of a social group for purposes of the statute. The Board agreed with the IJ. Defended by the government, the Board described Disi's social group as Muslim women *falsely* accused of adultery. This is not accurate. As the petitioners point out in their briefs, the truth or falsity of the accusations against the woman who is targeted for an honor killing makes no difference. Nor need a woman's transgression rise to the level of adultery as the term is understood in the United States. See BLACK'S LAW DICTIONARY (9th ed. 2009) (defining adultery as "[v]oluntary sexual intercourse between a married person and someone other than the person's spouse"). In Jordan, cause for an honor killing may arise where a woman commits such a "sin" as going for a walk with a man who is not her husband or relative. The social group that Disi and Sarhan propose includes all Jordanian women who, in accordance with social and religious norms in Jordan, are accused of being immoral criminals and, as a consequence, face the prospect of being killed without any protection from the Jordanian government.

We have acknowledged that the terms "race, religion, nationality," "particular social group," and "political opinion" are not necessarily self-defining and, consequently, that the Board's understanding of them is entitled to *Chevron* deference. *Chen v. Holder*, 607 F.3d 511, 512 (7th Cir. 2010); 18 U.S.C. § 1231(b)(3); see also *Chevron U.S.A. v. Natural Res. Def. Council*, 467 U.S. 837 (1984). Only official pronouncements of the Board are entitled to this treatment, however. If the Board

has spoken through a non-precedential decision that does not rely on binding Board precedent, its interpretation is not one that receives *Chevron* deference. *Arobelidze v. Holder*, 2011 WL 3132459 at *6 (7th Cir. July 27, 2011) (*en banc*). In addition, *Chevron* does not apply to factual findings; they are reviewed instead under the "substantial evidence" standard. *Vahora v. Holder*, 626 F.3d 907, 910 (7th Cir. 2010). Under the "substantial evidence" standard, we will uphold the Board's determination only if it is "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Id.*, quoting *Raghunathan v. Holder*, 604 F.3d 371, 376 (7th Cir. 2010). We may overturn the Board's decision "only if the record compels a contrary result." *Brucaj v. Ashcroft,* 381 F.3d 602, 606 (7th Cir. 2004).

The Act does not define "particular social group," "but the Board has defined it as a group whose members share 'common characteristics that members of the group either cannot change, or should not be required to change because such characteristics are fundamental to their individual identities.'" *Gatimi v. Holder*, 578 F.3d 611, 614 (7th Cir. 2009) (*Gatimi I*) (quoting *In re Kasinga*, 21 I. & N. Dec. 357, 365-66 (BIA 1996), and citing *In re Acosta*, 19 I. & N. Dec. 211, 233-34 (BIA 1985)). The Board has suggested that a key characteristic of a "particular social group" is its social visibility. *E.g.*, *In re S-E-G-*, 24 I. & N. Dec. 579, 582-86 (BIA 2008). In this case, the Board relied on social visibility to decide against Disi's proposed group. This court decided in *Gatimi I*, however (after the IJ ruled) that the social visibility criterion "makes no sense," and we rejected it as

inconsistent with the Board's and our own past cases. 578 F.3d at 615-16. "Women who have not yet undergone female genital mutilation in tribes that practice it," we wrote, "do not look different from anyone else." *Id.* at 615. So, too, when it comes to women whose behavior leads them to be threatened with honor killings: except at the moment when they are talking to a strange man, or expressing affection in an "impermissible" way, they are indistinguishable from all other women before they are murdered by their families.

The Board also reasoned that the members of Disi's proposed group have nothing in common except "a shared experience with other members of Jordanian society who have been targeted for honor killings." This conclusion is based on a misapplication of the Board's legal standard to the facts before it. We realize that the agency "has a legitimate interest in resisting efforts to classify people who are targets of persecution as members of a particular social group when they have little or nothing in common beyond being targets." *Gatimi I*, 578 F.3d at 616. That is why people who are persecuted solely because they have cooperated with police or people who are debtors to the same creditor are not considered to be part of a defined social group. *Id.* (referring to *Scatambuli v. Holder*, 558 F.3d 53 (1st Cir. 2009), *Castillo-Arias v. U.S. Att'y Gen.*, 446 F.3d 1190 (11th Cir. 2006), and *Cruz-Funez v. Gonzales*, 406 F.3d 1187, 1191-92 (10th Cir. 2005)). The social group in this case, however, does not suffer from that flaw. It is a function of a pre-existing moral code in Jordanian society, just as the dress code for "modest" women that helped to

define a social group in *Yadegar-Sargis v. INS,* 297 F.3d 596 (7th Cir. 2002). Social stigma causes the violence. Society as a whole brands women who flout its norms as outcasts, and it delegates to family members the task of meting out the appropriate punishment—in this case, death. The Board's factual finding to the contrary is not supported by substantial evidence. (To the extent that this Board decision may have added to the Board's existing standards, we note that it is not entitled to *Chevron* deference because it is a non-precedential opinion. 8 CFR § 1003.1(g) (2011); BIA, Practice Manual, 1.4(d), 4.6(d) (2004). *Arobelidze,* 2011 WL 3132459 at *6.)

Disi's proposed social group is consistent with others we have found in analogous circumstances. *Sepulveda v. Gonzales,* 464 F.3d 770, 771-72 (7th Cir. 2006), holds that former subordinates of the attorney general of Colombia who had information about insurgents plaguing that nation are members of a social group. That opinion also contains a useful list of other qualifying examples, including "the educated, landowning class of cattle farmers targeted by Colombian rebels; . . . parents of Burmese student dissidents; and children who escaped after being enslaved from Ugandan guerillas who had enslaved them." *Id.* (citations omitted). *Gatimi I* recognized as a social group the former members of a violent criminal faction in Kenya called the Mungiki, 578 F.3d at 615; and *Benitez Ramos* concluded that former gang members who face persecution after quitting are members of a particular social group, 589 F.3d at 429-30. Women facing honor killings in Jordan are no less cohesive than these groups and no more able to

shed the stigmatizing characteristics that render them victims. Consider how similar women in Disi's position are to the social groups recognized in *Agbor v. Gonzales*, 487 F.3d 499, 502 (7th Cir. 2007) (women who fear they will be victims of female genital mutilation), *In re Kasinga*, 21 I. & N. Dec. 357 (BIA 1996) (same), *Yadegar-Sargis*, 297 F.3d at 603 (Christian women in Iran who do not wish to adhere to the Islamic female dress code), *Lin v. Ashcroft*, 385 F.3d 748, 752 (7th Cir. 2004) (Chinese women who face forced sterilization), and *Bi Xia Qu v. Holder*, 618 F.3d 602, 607-08 (6th Cir. 2010) (women who are sold or forced into marriage and involuntary servitude). We conclude that Disi is a member of the particular social group of women in Jordan who have (allegedly) flouted repressive moral norms, and thus who face a high risk of honor killing.

To the extent that Disi is proceeding under the CAT, as we mentioned earlier, she does not need to show that she belonged to a particular social group. For that claim, one can skip down immediately to parts III.C. and IV of this opinion; those sections address the issues that are common to her withholding claim and her CAT claim.

B

Addressing Disi's withholding claim, we conclude that she has met her burden of demonstrating a clear probability that, if returned to Jordan, she would be persecuted on account of her membership in the social group she has identified. The IJ, the Board, and the Attorney General all take the position that if Besem did

kill Disi, his action would reflect only a personal dispute, not anything based on her membership in a broader social group. If that were an accurate description of the situation, the government would be correct that relief is unavailable. See, *e.g.*, *Grava v. INS*, 205 F.3d 1177, 1181 n.3 (9th Cir. 2000) ("Purely personal retribution is, of course, not persecution on account [of a protected ground]."). The IJ concluded, "[Besem] intends to harm the respondent, not because of [her] affiliation with other women accused of adultery, but rather, because he believes she has engaged in conduct that would bring dishonor to the family." This was evident, the IJ thought, because there was no indication "that Besem is actively seeking out other women accused of adultery." The Board and the government's briefs repeat this position almost verbatim, including the argument that Besem's dispute must be personal because he is not threatening death to other women.

Perhaps there is superficial appeal to this argument, but its force dissipates quickly when we examine it more carefully. There is no personal dispute between Disi and her brother. He has not vowed to kill her because of a quarrel about whether she or Besem should inherit a parcel of land, or because she did a bad job running his store, or because she broke Besem's favorite toy as a child. She faces death because of a widely-held social norm in Jordan—a norm that imposes behavioral obligations on her and permits Besem to enforce them in the most drastic way. The dispute between Disi and Besem is simply a piece of a complex cultural construct that entitles male members of families dishonored by

perceived bad acts of female relatives to kill those women. The man who does the killing may have a personal motivation in the sense that he is angry that his sister has dishonored the family, or he may regret the need to take such an irrevocable step. Either way, he is killing her because society has deemed that this is a permissible—maybe in some eyes the only—correct course of action and the government has withdrawn its protection from the victims. The very fact that these are called "honor killings" demonstrates that they are killings with broader social significance.

This helps to explain why the fact that Besem does not have either a duty or (we assume) the inclination to kill women from other families is immaterial. The social code that Besem follows has anointed him (or another of Disi's male relatives) as the person with the right to kill the woman who dishonored his family; it has not given him the role of killing women who dishonor other men's families. In the same way, in a society that practices female genital mutilation, each family is responsible for carrying out the operation on its own girls. But the families are not taking this step to make a personal statement. They do it because their society tells them that they are harboring an outcast and their own social standing will suffer if they do nothing. The fact that Besem has not killed others says nothing about whether his persecution of Disi will be on account of her membership in a particular social group. Imagine the neo-Nazi who burns down the house of an African-American family. We would never say that this was a personal dispute because the neo-Nazi did not burn

down all of the houses belonging to African-Americans in the town. The situation here is analogous. If Besem killed Disi it would be on account of her membership in the particular social group to which she has been assigned.

C

That leaves the question—relevant both to withholding and the CAT—whether it is probable that Besem actually will kill Disi if she returns to Jordan. After hearing Disi's and Sarhan's testimony on that issue, the IJ wrote, "In regards to the details of the threat made by Besem, and the respondents' testimony about the manner and circumstances of the threat and the fear they experienced after it was made, the Court finds that the testimony was credible." The Board said nothing about that credibility finding. When he issued his decision, the IJ listed as a reason for denying relief that he did not think that Disi faced a continuing threat from Besem. The IJ's opinion says that its "limited credibility judgment does not extend to the respondents' speculation that [Disi] will be assassinated in an honor killing on her return to Jordan or that the Jordanian government is unable or unwilling to protect her." Perhaps this means that the IJ thought that Disi and Sarhan genuinely believed that Besem would kill Disi, but that their belief was unreasonable. But that is not what he said. We cannot reconcile the judge's willingness to believe the evidence that Besem has sworn to carry out this murder with his later dismissal of that threat as entirely speculative.

In all these cases, the prospect of harm occurring in the future is an inference based on facts in the record. The

IJ accepted the evidence in the record showing that Besem made these explicit threats. This included not only Disi's and Sarhan's credible account of the danger posed by Besem, but also evidence that Besem had been abusive to Disi in the past and the letter from Sarhan's father that recounted Besem's plan to kill Disi. There is literally no evidence on the other side of the balance in this record—nothing to cast doubt on Disi's testimony, and nothing to indicate that Besem has forgiven or forgotten Disi's alleged dishonorable act. Without such evidence, the record overwhelmingly supports the proposition that it is more likely than not that Besem will either severely harm or murder her if she is returned to Jordan. *Cf. Shtaro v. Gonzales*, 435 F.3d 711, 715 (7th Cir. 2006).

## IV

This brings us to the role of the Jordanian government. "Persecution is something a *government* does, either directly or by abetting (and thus becoming responsible for) private discrimination by throwing in its lot with the deeds or by providing protection so ineffectual that it becomes a sensible inference that the government sponsors the misconduct." *Hor v. Gonzales*, 400 F.3d 482, 485 (7th Cir. 2005); see also *Balogun v. Ashcroft*, 374 F.3d 492, 499 n.8 (7th Cir. 2004). Disi contends that the government of Jordan cannot and will not do anything to protect her, but the agency rejected this argument. After reviewing the evidence of the Jordanian government's treatment of honor crimes, we

conclude that the record permits no conclusion other than that the government is ineffective when it comes to providing protection to women whose behavior places them in the group who are threatened with honor killings. We note that this showing satisfies both the standards for finding governmental action for purposes of withholding and also those under the CAT, which requires that the "pain or suffering" must be "inflicted by or at the instigation of or with the consent or *acquiescence* of a public official or other person acting in an official capacity." 8 C.F.R. § 208.18 (emphasis added).

## A

The Board had before it a substantial amount of information about honor killings in Jordan, including the State Department's 2007 Country Report on Human Rights Practices for Jordan, http://www.state.gov/g/drl/rls/hrrpt/2007/100598.htm, an Amnesty International publication, "Legalized Murder: Killing for 'Honor'" (see Agency Record at 437), a Human Rights Watch publication called, "Honoring the Killers," (see Agency Record at 514), a law journal article, Valerie Plant, *Honor Killings and the Asylum Gender Gap*, 15 J. TRANSNAT'L L. & POL'Y 109 (2005), and various other newspaper accounts and affidavits about the problem of honor killings.

According to the State Department's 2007 report, during that year there were "17 reported instances of honor crimes that resulted in the death of the victim, although activists reported that additional unreported cases likely

occurred. A November [2007] UN Development Fund for Women study stated that 25 percent of honor crime victims in the country were killed merely because they were suspected of involvement in an illicit relationship." U.S. Dep't of State, Country Report on Human Rights Practices for Jordan (2007). At oral argument, the government called our attention to the fact that this amounts to 17 honor killings during a one-year period in a country with a population of 6 million. Apparently it meant to suggest that the low number of honor killings means it is not much of a problem. We do not see the logic; a common (though not inevitable) feature of persecution is that the victims come from minority populations. That there are few publicly recorded instances of killings within a particular social group does not mean that the U.S. government is free to remove someone who has experienced a direct and credible threat of such a killing. Nor does it address the twin problems of underreporting and measures short of killing (such as mutilation) that take place. Compare the mutilation described by John Wendle, *The Aisha Bibi Case: Her Father Wants to Petition the Taliban for Justice,* TIME, July 14, 2011 (woman whose ears and nose were sliced off for failing to adhere to Shari'a law).

We find similarly unconvincing the unadorned fact that all 17 honor crimes committed during 2007 were prosecuted. Prosecution at times is an empty gesture. The sentences given out in Jordan for honor crimes show that prosecutions of honor crimes result in little more than a slap on the wrist. The State Department put it this way: "While the defendants are almost always

universally found guilty, defendants often received token sentences, with the charges often reduced from premeditated murder to manslaughter. Many men convicted of an honor crime received minimal prison sentences, usually no more than six months." U.S. Dep't of State, Country Report on Human Rights Practices for Jordan (2007). A six-month sentence for this kind of premeditated murder, when all other murders are punished much more severely, sends a strong social message of toleration for the practice.

Such lenient sentences are made possible by a legal framework that favors those who commit honor killings. The Board had information about the Jordanian legal regime before it, but it did not discuss the legal framework in either of its decisions. Article 340 of the Jordanian penal code provides a legal justification for honor crimes. Efforts to repeal that provision have failed repeatedly in the elected lower house of Jordan's Parliament. Moreover, those who commit honor killings often invoke article 98 of the code, which reduces penalties when the crime is committed in a "fit of fury." According to one report that the agency considered:

> If the extenuating excuse is established for a crime punishable by death, such as premeditated murder, article 98 provides that the penalty be reduced to a minimum of one year in prison. For other felonies, it is reducible to a minimum of six months and a maximum of two years. Moreover, courts may further halve the sentence if the victim's family "waives" its right to file a complaint of the crime.

In murders for "honor," given the family's complicity in the crime, the family nearly always "waives" the right to file a complaint. Thus, "honor" killers may receive sentences of six months—and often do. If a killer has served that much time awaiting trial, the sentence may be commuted to time served and he may walk away a free man.

Though gender-neutral in language, article 98 in practice is applied to benefit only men.

Human Rights Watch, *Honoring the Killers* (Agency Record at 532). This legal regime and the minimal punishments that result mean that the Jordanian government at best does almost nothing and at worst promotes the practice of honor killings.

The only protection that Jordan offers to those who would otherwise become victims is voluntary imprisonment; a woman who fears that she is in danger may turn herself in to a prison where she can be kept in custody. Jordanian authorities "regularly place[] potential victims of honor crimes in involuntary protective custody . . . where some have remained for up to 20 years." U.S. Dep't of State, Country Report on Human Rights Practices for Jordan (2007). At the end of 2007, at least 15 women were in protective custody. This practice strikes us as being much closer to persecution than to protection from harm—the victim must choose between death and an indefinite prison term (indeed, a term longer by an order of magnitude than the one faced by her persecutor). In this connection, it is important to recall that the INA prohibits removal to a

country where "the alien's life *or freedom* would be threatened" on account of a protected ground. 8 U.S.C. § 1231 (emphasis added).

Little seems to have changed in Jordan. The State Department's report from 1999 explained that the law allowed for reduced punishments for honor crimes and that law enforcement treatment of men accused of honor crimes "reflects widespread unwillingness to recognize the abuse involved or take action against the problem." U.S. Dep't of State, Country Reports on Human Rights Practices for Jordan (1999), http://www.state.gov/g/drl/rls/hrrpt/1999/418.htm. In that year there were at least 16 honor killings in Jordan; the police imprisoned women to protect them; and the Jordanian legislature rejected efforts to reform the penal code. *Id.* Compare to these facts the report from 2009 (which the agency did not consider but to which we may refer in the course of reaching our decision, *Agbor v. Gonzales*, 487 F.3d 499, 503 (7th Cir. 2007)), which relates that "[v]iolence and abuse against women continued, including . . . numerous honor crimes" and that "[a]uthorities prosecuted the 24 reported instances of homicides related to honor crimes that occurred during the year." U.S. Dep't of State, Country Report on Human Rights Practices for Jordan (2009), http://www.state.gov/g/drl/rls/hrrpt/2009/nea/136071.htm. The only bright spot in this picture came from one newly launched initiative:

> On July 28, [2009,] the chief judge of the criminal courts announced the establishment of a special

criminal court tribunal to hear all honor crime cases. In its first ruling on October 12, [2009,] the tribunal issued a 15-year murder sentence . . . . This sentence marked the first time a lower court issued a full murder sentence in an honor crime case without granting some form of leniency.

*Id.* The report contrasts this long prison term to the typical six-month sentences and then puts the reform effort in context: "Despite the judicial efforts the government had no plan or program to change public attitudes toward honor crimes or to deter future killings, and it had made no legislative changes to strengthen sentencing guidelines." *Id.* This final statement represents the strongest condemnation that the State Department has issued relating to the Jordanian government's effort to curb honor killings.

## B

After reviewing these materials, the IJ decided that "[t]he objective evidence of record does not establish that the government of Jordan would be unable or unwilling to protect the respondent from future harm." The Board agreed, concluding that "the Jordanian government condemns the practice of honor killings." We are at a loss to understand how they came to this conclusion in light of the evidence we have just reviewed.

The IJ noted that honor crimes are punished much less severely than other crimes (quite an understatement—the 2007 State Department report says that in

ordinary cases the maximum penalty for first-degree murder is death, and the maximum penalty for second-degree murder is 15 years in prison), but he added that "various non-governmental organizations, with the support of the current King and Queen, are *trying to reform* the penal code." (Emphasis added.) Attempted reform, like a bill that fails to become law, does not count as concrete government action. In fact, the only concrete measure the agency could name that the Jordanian government has taken was its offer to put women in jail if they felt threatened. The agency said with commendable understatement that this "is not an attractive option for victims." As we explained above, it is not an option at all—it is direct persecution, in the form of deprivation of an innocent person's liberty, by the government.

The agency ignored strong evidence of governmental toleration of, or indifference to, honor crimes. *Cf. Gatimi I*, 578 F.3d at 617. Attempts to amend laws to help curb violence against women are welcome steps, but they are not evidence that the government of Jordan has the power or the desire to protect a woman in Disi's position. Nor is there much evidence that efforts are coming from within the Jordanian government—most reforms seem to be proposed by non-governmental organizations. Other cases recognize the problem of honor killings and the government's lackadaisical attitude. See *Suradi v. Holder*, 2011 WL 2215548, at *2 (9th Cir. June 8, 2011) ("The IJ's finding that the Jordanian government does not acquiesce in honor killings is not supported by substantial evidence."). See also *Abdelghani v. Holder*, 309

F. App'x 19, 22 (7th Cir. Feb. 3, 2009); *Yaylacicegi v. Gonzales*, 175 F. App'x 33, 36 (7th Cir. Mar. 29, 2006). The Sixth Circuit decided in *Khalili v. Holder*, 557 F.3d 429 (6th Cir. 2009), that a man fearing he might be killed because of marital misconduct if he returned to Jordan was not entitled to withholding of removal. The obvious difference between that case and this one is that the petitioner in the Sixth Circuit was not a female, and the problem we have identified is one that concerns violence by men against women.

We conclude that the agency reached the wrong conclusion. The government of Jordan is complicit in the harm that Disi will suffer at the hands of her brother.

## V

We must address two remaining issues before we conclude. The agency decided that even if the Sarhans were otherwise entitled to relief, withholding of removal or protection under the CAT was not necessary because they had not shown that they would be unable to relocate to avoid Besem once they arrived in Jordan. The IJ did not provide much reasoning to support this conclusion, the Board did not mention relocation at all, and the government's brief does not address the issue. This lack of reasoning is alone enough to justify remanding the issue to the agency. *E.g.*, *Ssali v. Gonzales*, 424 F.3d 556, 564 (7th Cir. 2005). But there is a deeper problem. "Relocating to another part of the country does not mean living in hiding." *Agbor*, 487 F.3d at 505. The evidence indicates that Besem will be looking for

Disi specifically; in a country the size of Jordan, she would have to live in hiding to avoid him. (Jordan is 34,495 square miles, see http://travel.nationalgeographic.com/travel/countries/jordan-facts/, just a little bit larger than the State of Maine, which is 33,128 square miles. See http://www.theus50.com/area.php.)

Finally, the government urges that, even if we conclude that further proceedings are warranted, we should dismiss Sarhan's derivative claim on the ground that the Act does not provide benefits to an alien's family when the alien claims withholding of removal or relief under the CAT. Neither the IJ nor the Board appears to have considered whether Sarhan's case should be rejected on this ground, because they chose instead to deny relief to both petitioners. That means that the government's alternative basis for affirming the agency's decision in part is not before us. "The Supreme Court of the United States has admonished, in [*SEC v. Chenery*, 318 U.S. 80, 87-88 (1943)], that we may not sanction an agency decision based upon the post-hoc rationalizations of appellate counsel for the agency's decision." *Moab*, 500 F.3d at 659.

In any event, it is not apparent to us at this juncture that the government's position is correct. While courts have recognized that the provisions of the INA governing asylum *explicitly* permit derivative claims and that those governing withholding of removal do not, *e.g.*, *Ali v. Ashcroft*, 394 F.3d 780, 782 n.1 (9th Cir. 2005) (comparing 8 U.S.C. § 1158(b)(3) with 8 U.S.C. § 1231(b)(3)), we see no reason to read into the Act's silence a

hidden rule that bars derivative claims in all instances where an alien seeks withholding of removal. Moreover, Sarhan's claim may not even be derivative: in some instances persecution of one spouse can itself constitute persecution of the other spouse. *Kone v. Holder*, 620 F.3d 760, 765 (7th Cir. 2010) (quoting *Gatimi I*, 578 F.3d at 617 for the proposition that "[g]enital mutilation of one's wife, unless one happens to be a supporter of the practice, is a way to punish one"). If Disi were compelled to return to Jordan because Sarhan was removed (maybe for financial reasons, or simply to keep the family together), perhaps the threat of Disi's death would be sufficient persecution of Sarhan to grant him withholding as well. On remand, Sarhan will have the opportunity to develop his own claims for relief apart from those that are derivative of Disi's. We recognize that the Board may conclude that Sarhan is not eligible for relief. If it does, however, it is always possible to make a final appeal to the Attorney General for the exercise of his humanitarian power in this painful situation. These questions are for the agency in the first instance; we do not resolve them here.

## VI

The practice of honor killing is still widespread in certain parts of the world. Along with female genital mutilation, human trafficking and slavery, spousal rape, and domestic battery, it is among the most severe abuses that women face around the globe. Vital though the enforcement of our immigration laws may be, it is equally important to give full force to the features of

those laws that are designed to give shelter in the United States to people who would experience extra-ordinary abuse if they were sent back to their home country. The laws regarding asylum, withholding of removal, and the United States's international obliga-tions under the CAT are no less important than the laws establishing the general rules for immigration. The Board's decision in this case looked too narrowly at the abhorrent practice of honor killing in Jordan. In so doing, it failed to realize that women whose behavior violates that society's moral norms (and who thus may suffer this consequence) form a coherent social group, that the ensuing death normally at the hand of a family member amounts to persecution on account of their membership in that group, and that the government continues to be unwilling or unable to stop this brutality.

In this case, Disi has shown that it is more likely than not that she will be murdered by her brother if she is returned to Jordan because she is part of this social group. The Jordanian government can or will do nothing to help her, and she cannot reasonably be expected to relocate, because Besem will track her down no matter where she is within Jordan. Sarhan's case and that of the children is more complex. What is clear is that further proceedings are necessary before either Disi or her family members can be removed. We there-fore GRANT the petitions for review and REMAND the cases to the agency for further proceedings consistent with this opinion.