In the

# United States Court of Appeals

## For the Seventh Circuit

No. 17-1998

RODRIGO RAMOS-BRAGA,

*Petitioner*,

*v.*

JEFFERSON B. SESSIONS III,
Attorney General of the United States,

*Respondent*.

Petition for Review of an Order of
the Board of Immigration Appeals.
No. A 097-837-809

ARGUED JANUARY 24, 2018 — DECIDED MAY 21, 2018
AMENDED AUGUST 14, 2018

Before BAUER, KANNE, and BARRETT, *Circuit Judges*.

PER CURIAM. Rodrigo Ramos-Braga, a citizen of Brazil, petitions for review of the denial of his second motion to reopen proceedings on his applications for special-rule cancellation of removal, withholding of removal, and protection under the Convention Against Torture (CAT). His motion was both nu-

merically barred and untimely filed with the Board of Immigration Appeals, but Ramos-Braga argued that these limits should be excused under the doctrine of equitable tolling for ineffective assistance of counsel or under a statutory exception based on changed country conditions. The Board determined that neither exception applied and that the time and numerical limits therefore barred his motion. Because the Board did not abuse its discretion, we deny the petition.

## I.

Ramos-Braga was raised in a neighborhood of São Paulo, Brazil that came to be controlled by a multi-national gang named the Primero Comando Capital (PCC). His father dealt drugs for the gang and was one of its managers, until he had a falling out with the gang's leader. Starting when Ramos-Braga was 13, the PCC tried repeatedly to recruit him, but he refused to join. Unrelenting, PCC members caught Ramos-Braga at school and around town, physically attacked him at least ten times, and eventually threatened him with death. Initially, Ramos-Braga reported these attacks to Brazilian officials, but local police did nothing in response and eventually, officers would beat him when he made reports, claiming that he was a suspected gang member. At age 16 he stopped reporting his PCC encounters to police because in one instance officers beat him until he spat blood, and he came to believe that the police were paid by the PCC to harm him. When Ramos-Braga was about 18 years old, PCC members offered him one "last chance" to join; after he refused they assaulted him with pipes—severely injuring him and hospitalizing him for two weeks. He stopped attending college and spent months moving between homes of his family members in other parts of the city and another town. When he returned to São Paulo,

a PCC member shot him from behind, putting him back in the hospital for days.

In January 1999, three months after being shot, Ramos-Braga was admitted to the United States on a student visa. He eventually married a U.S. citizen, but the two had a tumultuous relationship. Ramos-Braga estimated that his wife physically abused him over 100 times.

Seven years after he arrived, the Department of Homeland Security issued a Notice to Appear charging Ramos-Braga with overstaying his visa and therefore being removable under 8 U.S.C. § 1227(a)(1)(B). Ramos-Braga conceded his removability and eventually sought special-rule cancellation of removal for battered spouses and withholding of removal under 8 U.S.C. § 1231(b)(3) and CAT.

While removal proceedings were pending, Ramos-Braga and his wife got into a fight. He was convicted of battery under Wisconsin law and, after he used a jailhouse phone to ask his wife not to testify, intimidation of a witness, WIS. STAT. §§ 940.19(1), 940.42. DHS added a charge that he was removable under 8 U.S.C. § 1227(a)(2)(A)(ii) for having been convicted of two crimes involving moral turpitude. He challenged removability on this ground.

At his removal hearing, Ramos-Braga testified about the beatings by PCC members and police officers. He also said that the gang recruited young men and that he believed he specifically was recruited because of something his father had done, but he did not know what. The IJ found Ramos-Braga credible but denied his applications for special-rule cancellation and withholding and ordered him removed to Brazil.

To obtain special-rule cancellation, Ramos-Braga had to prove, among other things, that he had been battered by his wife and was not subject to certain disqualifying grounds of removability or inadmissibility. *See* 8 U.S.C. § 1229b(b)(2). The IJ concluded that Ramos-Braga was disqualified on two grounds: his convictions for battery and witness intimidation were crimes of moral turpitude, and he had been confined in excess of five years total for past convictions. *See* 8 U.S.C. §§ 1229b(b)(2)(A)(iv),      1182(a)(2)(A)(i)(I),      1182(a)(2)(B), 1227(a)(2)(A)(ii).

Ramos-Braga could receive withholding of removal in two ways: either under statute or under CAT. To receive withholding of removal under statute, he had to prove that it was more likely than not that, if he were removed, he would be persecuted in Brazil on account of his membership in a particular social group. *See id.* § 1231(b)(3); 8 C.F.R. § 1208.16(b). The IJ concluded that Ramos-Braga suffered past persecution but presented "little proof" that this persecution was on account of his particular social group, namely his family ties to his father. Instead, "the greater weight of the evidence support[ed] the conclusion that he was persecuted because he refused the PCC's recruitment efforts." To merit withholding under CAT, Ramos-Braga had to demonstrate that it was more likely than not that, if removed to Brazil, he would be tortured by or with the acquiescence of a public official. *See* 8 C.F.R. § 1208.16(c)(2). The IJ determined that he did not carry his burden to prove that he was more likely than not to be tortured by either the police or PCC.

Ramos-Braga, who was represented by counsel, appealed the denial of his applications for withholding but not the denial of special-rule cancellation. The Board affirmed the IJ's decision on December 18, 2014.

In January 2015, Ramos-Braga petitioned this court for review and moved to stay his removal. His attorney ended the representation over a fee dispute, however, and Ramos-Braga continued pro se, filing motions in this court and, after his petition was denied, another petition for review that was dismissed for lack of jurisdiction for having been filed more than 30 days after the final order of removal.

Ramos-Braga, still pro se, moved the Board to reopen proceedings on his applications for relief from removal and to reconsider its dismissal order. The Board denied his motion as untimely in June 2015, but he maintains he never received notice of this decision.

Ramos-Braga filed a second pro se motion to reopen or reconsider on August 31, 2015, and at issue here is the Board's denial of that motion on the grounds that it was untimely and successive. Ramos-Braga explained that his motion to reopen was late because his former attorney had promised repeatedly to file a timely motion, but he never did. He also said that conditions in Brazil had gotten worse since the hearing, and he offered evidence to that effect. A year later, in August 2016, Ramos-Braga retained his present attorney, who filed a supplemental brief supporting the still-pending second motion to reopen. Through counsel, Ramos-Braga argued that his second motion to reopen should not have been barred because the exceptions for equitable tolling for ineffective assistance of counsel and changed conditions in the country of removal

excused his noncompliance. Regarding the first exception, Ramos-Braga said that his attorney in the original appeal to the Board had waived meritorious arguments for special-rule cancellation and withholding under CAT.

The Board denied the second motion to reopen based on its conclusion that Ramos-Braga did not meet either exception. Equitable tolling could not benefit him, the Board said, because he did not file his motion as soon as possible after learning of his former attorney's alleged errors, nor was he prejudiced by any possible error. The Board also concluded that he did not offer evidence of conditions in Brazil that had changed since the removal hearing; his evidence of "ongoing" PCC threats were a "continuation" of past harms he experienced in Brazil.

## II.

Noncitizens can file just one motion to reopen immigration proceedings, and that motion must be submitted within 90 days of the final order of removal. *See* 8 U.S.C. § 1229a(c)(7)(A), (C)(i). These time and numerical limits are, however, non-jurisdictional claim-processing rules, subject to the doctrine of equitable tolling and statutory exceptions. *See Mata v. Lynch*, 135 S. Ct. 2150, 2154 (2015); *Ji Cheng Ni v. Holder*, 715 F.3d 620, 623 (7th Cir. 2013) (citing 8 U.S.C. § 1229a(c)(7)(C)(ii)); *Pervaiz v. Gonzales*, 405 F.3d 488, 490 (7th Cir. 2005).

The question here is narrow: we must decide only whether the Board wrongly concluded that neither equitable tolling nor changed conditions excuse the limits on Ramos-Braga's

second motion to reopen.[1] This court reviews the Board's denial of a motion to reopen for an abuse of discretion, and an abuse occurs if the decision lacks a "rational explanation, inexplicably depart[s] from established policies, or rest[s] on [either] an impermissible basis," *Marinov v. Holder*, 687 F.3d 365, 368 (7th Cir. 2012), or legal error, *Habib v. Lynch*, 787 F.3d 826, 831 (7th Cir. 2015).

## A. Equitable Tolling

Ramos-Braga contends that the Board wrongly refused to equitably toll the limits on his second motion to reopen his applications for special-rule cancellation and withholding of removal under CAT. Equitable tolling applies if the noncitizen demonstrates prejudice from counsel's deficient performance and exhibits diligence by seeking relief as soon as reasonably possible. *See Yusev v. Sessions*, 851 F.3d 763, 767 (7th Cir. 2017).

Even if we assume the Board erred in its analysis of diligence, Ramos-Braga has failed to show that he was prejudiced by his former attorney's errors. Ramos-Braga argues that he was prejudiced by the attorney's failures to appeal (1) the denial of his application for special-rule cancellation and (2) the IJ's conclusion, in denying CAT relief, that the PCC was not likely to torture him with the government's acquiescence upon his return to Brazil.

---

[1] Ramos-Braga also argues that the Board wrongly denied his motion to reconsider the Board's order dismissing his original appeal. The Board denied this motion also for being inexcusably untimely and numerically barred, *see* 8 U.S.C. § 1229a(c)(6)(A), (B); 8 C.F.R. § 1003.2(b)(2), without considering whether the underlying dismissal order required reconsideration. We therefore have no merits decision to review on the issue of reconsideration.

### 1.      Special-Rule Cancellation

Ramos-Braga contends that his former attorney should have appealed the denial of special-rule cancellation and argued that he remained eligible for this relief because, contrary to the IJ's conclusion, his Wisconsin battery conviction is not a crime involving moral turpitude.

But, as the Board determined in denying the motion to reopen, this battery conviction was a crime involving moral turpitude under the law as it existed when Ramos-Braga appealed in December 2014. Specifically, the Board concluded that Ramos-Braga's battery conviction with a domestic-abuse enhancement, WIS. STAT. §§ 940.19(1), 973.055(1)(a), was properly classified by the IJ as a crime involving moral turpitude under *Matter of Silva-Trevino*, 24 I. & N. Dec. 687 (2008) (*Silva-Trevino I*). The Board observed that *Silva-Trevino I* was still "controlling" when Ramos-Braga's former attorney appealed from the removal order, and thus Ramos-Braga was not prejudiced by the failure to appeal on this ground.[2]

Ramos Braga contends that his former attorney should have argued on appeal to the Board that the IJ misapplied *Silva-Trevino I*. But the IJ's analysis was proper. *Silva Trevino I* established a three-step framework for determining whether an alien's conviction involved moral turpitude. First, the IJ had to decide whether there was a "realistic probability" that the criminal statute might be applied to punish conduct that

---

[2] *Silva-Trevino I* was vacated by the Attorney General, *Matter of Silva-Trevino*, 26 I. & N. Dec. 550, 553 (2015) (*Silva-Trevino II*), and the Board has now adopted the categorical approach as defined in *Descamps v. United States*, 570 U.S. 254 (2013), *see Matter of Silva-Trevino*, 26 I. & N. Dec. 826, 830–31 (BIA 2016) (*Silva-Trevino III*).

involves moral turpitude. If so, the IJ was next required to look to the record of conviction—the indictment, judgment, jury instructions, guilty plea, or plea transcript—to determine if the conviction actually involved moral turpitude. And finally, if the record of conviction did not answer this question, the IJ had to inquire into the facts of the prior offense by looking to "any evidence, otherwise admissible in removal proceedings." *Silva-Trevino I*, 24 I. & N. Dec. at 698, 704; *Sanchez v. Holder*, 757 F.3d 712, 717–18 (7th Cir. 2014). The IJ here, at the last step, looked to a police statement attached to the criminal complaint and determined that Ramos Braga had committed a crime involving moral turpitude because he intentionally caused bodily harm to his wife. *See Matter of Sanudo*, 23 I. & N. Dec. 968, 971–72 (BIA 2006).

Ramos-Braga asserts that the IJ should not have proceeded past step one, because the Wisconsin battery statute under which he was convicted was not "divisible," meaning it contained only a single set of elements to prove. *See Descamps v. United States*, 570 U.S. 254, 257 (2013). But *Silva-Trevino I* did not permit the IJ to end the inquiry by finding the statute indivisible; instead, it required the IJ to proceed to step two if the statute "encompasses both conduct that involves moral turpitude *and* conduct that does not." 24 I. & N. Dec. at 698–99. Ramos-Braga does not contest the IJ's conclusion that a Wisconsin battery conviction with a domestic-abuse enhancement reaches conduct that involves moral turpitude. Hence, *Silva-Trevino I* required the IJ to proceed past step one.

Still, Ramos-Braga says that *Descamps*, a Supreme Court criminal sentencing case, required a categorical approach that precluded the IJ from looking past an indivisible battery statute to decide whether his crime involved moral turpitude.

570 U.S. at 257–58. But *Descamps* did not overrule *Silva-Trevino I*, which set forth in unequivocal terms the framework that the Attorney General required IJs to follow when deciding if a conviction involved moral turpitude. Furthermore, *Silva-Trevino I* considered the categorical approach applied in criminal cases like *Descamps* and did not find a compelling need for this approach in the immigration context. *See Silva-Trevino I*, 24 I. & N. Dec. at 700 ("[T]he rationale for the limits … on factual inquiries in criminal sentencing cases does not carry over to the immigration question" required under the immigration statute.). Unlike the categorical approach in *Descamps*, *Silva-Trevino I* instructed IJs to proceed to step two: "If it appears that the government in question would apply its criminal statute to reach both turpitudinous and non-turpitudinous acts—perhaps because the statute is divisible, *but also* because the statute could realistically cover a wide range of conduct." *Sanchez*, 757 F.3d at 717 (emphasis supplied). Although the Attorney General's new approach to determining a crime of moral turpitude adopts the categorical approach outlined by *Descamps*, the IJ was not permitted to ignore the Attorney General's then-controlling decision by anticipating this change in the law. The IJ was bound by *Silva-Trevino I* and the case law of our circuit. *Mata-Guerrero v. Holder*, 627 F.3d 256 (7th Cir. 2010); *Ali v. Mukasey*, 521 F.3d 737 (7th Cir. 2008).

Ramos-Braga also argues that the IJ erred at step three of *Silva-Trevino I* by ignoring evidence in the police statement that he was the victim, not the aggressor. But the IJ noted the police statement included Ramos-Braga's story that he was fleeing from his wife and accidentally struck her face with the door. Instead, the IJ credited the wife's version, also in the police statement, that Ramos-Braga struck her face with his hand

and pushed her into a shelf, causing her nose and lip to swell, bruise, and bleed. Thus, the IJ did not ignore evidence.

Because *Silva-Trevino I* still applied when Ramos-Braga appealed to the Board, he was not prejudiced by the lack of a challenge to the IJ's classification of his battery conviction in denying special-rule cancellation. If his attorney had raised the argument he presses now, the Board would have rejected it, as it reasonably did in denying the motion to reopen.

### 2. Withholding under CAT

Ramos-Braga argues next that he was prejudiced in the appeal of his denied CAT application. He contends that his former attorney should have argued that the IJ failed to consider evidence that, if he is removed to Brazil, the PCC would torture him without intervention by public officials. In denying the second motion to reopen, the Board said this potential error could not have prejudiced Ramos-Braga because the evidence he offered, to the IJ originally and in support of reopening, could not establish that official torture or acquiescence was more likely than not.

"CAT protection requires evidence that the Petitioner will be tortured by the government, or with the government's acquiescence." *Lopez v. Lynch*, 810 F.3d 484, 492 (7th Cir. 2016). Acquiescence means "the public official, prior to the activity constituting torture, ha[d] awareness of such activity and thereafter breach[ed] his or her legal responsibility to intervene to prevent such activity." 8 C.F.R. § 1208.18(a)(7); *Lopez*, 810 F.3d at 493. We will reverse the Board's conclusion that Ramos-Braga's evidence is insufficient only if the evidence compels the conclusion that official acquiescence is more

likely than not. *See Orellana-Arias v. Sessions*, 865 F.3d 476, 490 (7th Cir. 2017).

Relying on our precedent in *Rodriguez-Molinero v. Lynch*, 808 F.3d 1134 (7th Cir. 2015), Ramos-Braga argues that there is a "substantial risk" that the Brazilian government will acquiesce to his torture by the PCC if he is removed to Brazil. But his evidence does not compel that conclusion.

Ramos-Braga relies heavily on the violence he experienced at the hands of the police and the PCC when he was a teenager. Yet the fact that Ramos-Braga was beaten by police roughly twenty years ago does not show that he is likely to be tortured by officials today. *See Lopez*, 810 F.3d at 493 (noting that man who stabbed petitioner twenty-five years earlier may no longer seek to harm petitioner). Moreover, Ramos-Braga has offered nothing more than his own speculation that the police acted at the PCC's urging when they attacked him. *See Lhanzom v. Gonzales*, 430 F.3d 833, 845 (7th Cir. 2005) (reversing IJ's decision that rested on testimony for which witness had no personal knowledge). The evidence of his beatings by the PCC in the late 1990s is similarly stale. Even if the Brazilian government acquiesced to that violence, its conduct twenty years ago is not compelling evidence of how the government would respond to such violence today.

Ramos-Braga introduced more current evidence as well. His strongest evidence is an affidavit from his mother. In 2016, his mother complained to police after PCC members, allegedly acting on a vendetta against Ramos-Braga, robbed his grandfather at home in 2015 and threatened his mother in 2016. According to Ramos-Braga's mother, PCC members stated over the internet that they "will be waiting" for Ramos-

Braga when he returns home. Officers in one district referred his mother to another district, which promised to investigate the 2016 threats, but the investigation has not been resolved. Ramos-Braga takes the referral of the complaint from one office to another and the lack of resolution as evidence that the police are unwilling to protect his family—and, ultimately, him—from the PCC.

The PCC's threats to Ramos-Braga's family do offer support for his contention that the PCC is likely to torture him if he returns to Brazil. But CAT offers protection from government torture, not private conduct. Thus, Ramos-Braga cannot secure relief simply by showing a substantial risk that the PCC will torture him; he must demonstrate that there is a substantial risk that Brazilian officials will acquiesce in the torture. This is where Ramos-Braga's claim founders.

The police department's response to the complaint lodged by Ramos-Braga's mother falls far short of establishing that the police are indifferent to or complicit in the PCC's threats to Ramos-Braga's family. For one thing, the police promised to investigate—they neither ignored nor denied his mother's request for help. Ramos-Braga contends that the police gave his mother the run-around, but the evidence does not support that inference. Referring a complaint from one district to another is more consistent with bureaucracy than animosity, and the fact that the investigation is not yet resolved does not mean that the police are turning a blind eye to the PCC.

Again, we will only disturb the Board's determination if substantial evidence on the record compels a contrary conclusion. When reviewing a claim that the government acquiesced to torture, we have required much more evidence of official complicity or corruption to satisfy that standard than Ramos-

Braga has offered. For example, in *Rodriguez-Molinero*, we
granted a petition for review because the petitioner demon-
strated a substantial risk that the Mexican government would
acquiesce to, or even collaborate in, his torture by a drug car-
tel. 808 F.3d at 1138–1140. This conclusion was based on the
fact that the petitioner had been previously tortured by the
police at the behest of the drug cartel, as well as unchallenged
expert testimony that the Mexican government is rife with
corruption and helpless to prevent gang violence throughout
the country. *Id.* at 1136–37. In *Wanjiru v. Holder*, 705 F.3d 258
(7th Cir. 2013), we remanded a CAT claim because the IJ
brushed over "extensive evidence" that police and govern-
ment officials abetted and directed a gang that posed a threat
of torture to the petitioner. *Id.* at 266. Indeed, the International
Criminal Court had "confirmed charges (a step similar to
finding probable cause)" against two senior Kenyan officials
for allegedly using the gang to murder thousands of citizens.
*Id.* In *Mendoza-Sanchez*, 808 F.3d 1182 (7th Cir. 2015), we re-
manded (at the government's request) and said that an appli-
cant had a "strong" CAT claim because he had evidence that
police officers in Mexico routinely collaborated with and pro-
tected a nationwide gang that had targeted him. *Id.* at 1184–
85. A human-rights report from the State Department detailed
widespread corruption of Mexican police, who, at both the
city and state level, were directly involved in the activities of
drug organizations by "kidnapping, extort[ing], and provid-
ing protection for, or acting directly on behalf of, organized
crime and drug traffickers." *Id.* at 1184.

   In each of these cases, the petitioner showed that the gov-
ernment is utterly indifferent or downright complicit in the
face of violence and torture by gangs. Ramos-Braga argues

that the PCC wields similar influence in the Brazilian govern-ment, but his evidence belies that argument.

Ramos-Braga contends that the PCC has "infiltrated" the Brazilian police forces, and he offers a news article reporting that PCC members "may have participated" in explosives trainings for police officers in São Paulo. If gang members had infiltrated police forces, this would indeed be evidence that the government is unable to protect people targeted by the gang. *See Mendoza-Sanchez*, 808 F.3d at 1183, 1185. But the re-port Ramos-Braga offers falls well short of showing that PCC members are within the ranks of Brazilian police. According to the report, some of the explosives training courses were of-fered by private contractors who failed to perform back-ground checks—possibly allowing PCC members to register for the course without the knowledge of the São Paulo police department. Evidence of a poorly planned explosives training does not demonstrate that the Brazilian police have been in-filtrated by the PCC.

In fact, Ramos-Braga's own evidence undermines his ar-gument that officials and the PCC cooperate. The article about explosive trainings discloses that in 2012 the PCC frequently attacked police forces, and that the two sides committed around 200 "revenge killings" within a couple months. A 2014 article from a Brazilian newspaper shows that Brazilian offi-cials initiated a new operation against the PCC and detained members attempting to smuggle drugs out of the country. Other reports he offered show that police have arrested doz-ens of PCC members and that Brazilian authorities are in a "bloody struggle" to subvert the PCC. Ramos-Braga did offer a report from the Australian government showing that some Brazilian officials were corrupt as of 2012; police officers were

arrested for selling information to the PCC about investigations of the gang's drug trafficking, while other officers extracted bribes from the PCC through kidnapping and abusing the family of PCC members. However, the report does not show, as Ramos-Braga asserts, that corrupt police physically harmed citizens *to assist* the PCC.

Finally, Ramos-Braga presents news articles and a country report issued in 2013 by the U.S. Department of State that, taken together, show that police officers in Brazil "routinely" kill criminal suspects, targeting men from the "slums." These reports do not suggest police complicity with the PCC; Ramos-Braga introduces them to show that the police may target him because he is from the slums, and police in his hometown may attack him for resembling his father, a criminal. But reports that police officers target men from the slums *generally* is not evidence that they would torture Ramos-Braga *specifically*. *See Orellana-Arias*, 865 F.3d at 490 (concluding that country reports of government's acquiescence to violence against citizens was not evidence that government would acquiesce to torture of petitioner specifically); *Lopez*, 810 F.3d at 493 (deciding that petitioner, a gay man, did not show threat of violence specific to him by submitting reports that gay men have been victims of violence); *Rashiah v. Ashcroft*, 388 F.3d 1126, 1133 (7th Cir. 2004) (concluding that CAT relief was unavailable to applicant who offered country report describing instances of torture but no evidence that he would be specifically targeted). Twenty years ago police officers knew Ramos-Braga lived in the slums and suspected he was a criminal, but there is no evidence that these officers remain with the force or that they would recognize him today.

In sum, Ramos-Braga's past experiences are troubling, but his evidence does not compel the conclusion that Brazilian officials today would torture him or permit the PCC to do so. Thus we will not disturb the Board's conclusion that Ramos-Braga offered insufficient evidence of official acquiescence. And because Ramos-Braga's evidence is insufficient, he was not prejudiced by any possible attorney error in the appeal of his CAT application. The Board therefore did not abuse its discretion in deciding that equitable tolling did not apply to Ramos-Braga's second motion to reopen.

### B. Changed Conditions

Ramos-Braga also contends that changed conditions in Brazil warrant reopening his applications for withholding of removal. [3] No time or numeric limits apply to a motion to reopen that is based on "changed circumstances arising … in the country to which deportation has been ordered." 8 C.F.R. § 1003.2(c)(3)(ii). For this exception to apply, Ramos-Braga needs evidence of a changed country condition that is "material and was not available and could not have been discovered or presented" at the removal hearing. *See id*.; *Ji Cheng Ni*, 715 F.3d at 623. This court's task is to determine whether the Board abused its discretion in deciding that changed country conditions do not excuse the limits on Ramos-Braga's motion

---

[3] Ramos-Braga also incorporates into his withholding arguments his view that changed conditions in Brazil warrant reopening proceedings so that he can apply for asylum. But the Board never had an opportunity to consider arguments related to asylum because Ramos-Braga did not develop them in his motion to reopen at issue here. We therefore express no opinion on this portion of his petition.

to reopen. *See Kebe v. Gonzales*, 473 F.3d 855, 857 (7th Cir. 2007). We conclude that the Board did not abuse its discretion.

To show that conditions in Brazil have changed, Ramos-Braga offered evidence that: (1) the PCC has "marked" him to die because the gang's leader believes his brother and two cousins were killed by Ramos-Braga's father in 1997; (2) the PCC has "barbarically murdered" eight of Ramos-Braga's cousins, most recently in 2013; (3) the PCC has offered a reward for Ramos-Braga's whereabouts; (4) after the PCC learned that Ramos-Braga might return to Brazil, they robbed his grandfather at home using a gun in 2015 and threatened his mother over the internet in 2016; (5) one police district referred his mother's request to investigate the 2016 threats, and the other district promised to investigate the threats, but the investigation has not been resolved; and (6) Brazilian police have routinely committed extrajudicial killings of men from the slums whom they suspect to be criminals.

### 1.    Withholding under CAT

Pertaining to his CAT application, Ramos-Braga argues that the PCC's recent growth and threats are a changed condition that the Board "irrationally" discounted as a "continuation" of dangers that he previously experienced in Brazil. He relies on an out-of-circuit decision, *Malty v. Ashcroft*, 381 F.3d 942 (9th Cir. 2004), in which the Ninth Circuit said "changed circumstances will almost always relate to [an] initial claim … . The critical question is … whether circumstances have changed sufficiently that a petitioner who previously did not have a legitimate claim … now has a well-founded" claim. *Id.* at 945. A worsening PCC threat is, however, immaterial to whether Ramos-Braga's CAT application must be re-

opened. As discussed above, he needed but failed to offer evidence that compels finding that Brazilian officials would acquiesce to his torture by the PCC.

Ramos-Braga also argues that the Board ignored new evidence that he would face torture directly from public officials if he is removed to Brazil. He again points to the recent news articles reporting that Brazilian police have targeted men from the slums and criminal suspects for extrajudicial killings. He stresses that police in his hometown beat him, possibly suspecting he was a criminal because he lived in the slums. He says that his evidence, together, establishes a substantial likelihood that police officers will torture him. The Board, while considering Ramos-Braga's argument for equitable tolling, said that the evidence he offered—initially and with his second motion to reopen—did not show that officials were more likely than not to torture him.

We will reverse the Board's conclusion that Ramos-Braga's evidence is insufficient only if the evidence compels a contrary conclusion. *See Lopez*, 810 F.3d at 492–93. As explained above, the articles Ramos-Braga recently offered do not compel the conclusion that public officials are more likely than not to torture him. We have said that reports that officials have tortured members of a certain group do not necessarily demonstrate that a petitioner who belongs to that group would face a substantial risk of torture if removed. *Bernard v. Sessions*, 881 F.3d 1042, 1047–48 (7th Cir. 2018). To show a risk specific to him, Ramos-Braga needed evidence that Brazilian police would recognize him as part of the groups targeted for torture. *See Lopez*, 810 F.3d at 493; *Rashiah*, 388 F.3d at 1133. Yet he offered no evidence that Brazilian police today would suspect him of crime or would know, roughly twenty years

later, that he lived in the slums in 1998. To the extent he fears police torture because he would be forced to live in the slums if removed to Brazil, this fear of generalized violence is insufficient to establish that he in particular is more likely than not to be tortured. *See Lozano-Zuniga v. Lynch*, 832 F.3d 822, 830–31 (7th Cir. 2016).

Because Ramos-Braga did not present evidence that conditions in Brazil have changed such that he now may have a CAT claim, the Board did not abuse its discretion in denying his motion to reopen proceedings on that form of relief.

### 2.    Withholding under Statute

Ramos-Braga next argues that changed conditions in Brazil excuse the limits on his motion to reopen his application for withholding under statute, but again he is wrong. He first points to new evidence that the PCC's intent to kill him stems from the gang leader's desire to avenge the murders of his family members. But this motive has not changed since the killings of the gang leader's family in 1997, well before the 2014 removal hearing, and thus the motivation, though recently discovered, is not a changed condition.

Second, Ramos-Braga argues that the PCC's offer of a reward for his whereabouts is a changed condition, but he has not carried his evidentiary burden. To show that the reward offer is a changed condition, Ramos-Braga needed evidence that the offer was made after the removal hearing. *See Xiu Zhen Lin v. Mukasey*, 532 F.3d 596, 596–97 (7th Cir. 2008). In his petition he sidesteps his burden and contends the Board speculated that the reward offer might date back to 1998. But that is not what the Board said; it observed that the gang's intent to harm him dated that far back and said that no evidence,

including an affidavit from his mother's neighbor who re-
ported the reward offer, showed the offer was made after the
removal hearing. Instead of clarifying when the reward was
offered, Ramos-Braga says that the offer could not be from
1998 because the neighbor learned of it through her 19-year-
old son, a current PCC member who would have been an in-
fant then. But this reasoning is flawed; the offer may have
been old when the neighbor's son learned of it. As difficult as
it might have been for Ramos-Braga to gather evidence while
detained, he has never represented that he exhaustively inves-
tigated when this offer was made.

Last, Ramos-Braga disputes the Board's conclusion that
recent dangers posed by the PCC are a continuation of condi-
tions that existed before the removal hearing. Although wors-
ening conditions in the country of removal may constitute a
change that requires reopening, *see id.*; *Ji Cheng Ni*, 715 F.3d
at 627; *Mekhael v. Mukasey*, 509 F.3d 326, 327 (7th Cir. 2007),
the PCC's recent threats, robbery, and murders are immate-
rial to whether Ramos-Braga's application for withholding
under statute should be reopened. The IJ denied this applica-
tion not for lack of evidence of past persecution, but because
Ramos-Braga did not establish a nexus between his likely per-
secution by the PCC and his particular social group. Thus to
present evidence that conditions have degenerated so that he
now has a claim for withholding under statute, Ramos-Braga
needed to show a change related to this nexus between the
PCC's persecution and his social group based on ties to his
father. He did present newly found evidence of the PCC's mo-
tive for harming him, but again, that motive has not changed
since 1997.

In sum, Ramos-Braga failed to offer new, material evidence that conditions in Brazil have changed since the removal hearing.

### III.

The Board did not abuse its discretion by denying Ramos-Braga's second motion to reopen as numerically barred and untimely. Ramos-Braga neither experienced prejudice from his former attorney's potential errors nor presented new, material evidence that conditions in Brazil have changed since the removal hearing. Accordingly, the petition for review is

DENIED.