In the

# United States Court of Appeals
## For the Seventh Circuit

———————————

Nos. 17-1723 & 18-1911

WILLIAM YOVANNI MOLINA-AVILA,

*Petitioner*,

*v.*

JEFFERSON B. SESSIONS III,
Attorney General of the United States,

*Respondent*.

———————————

Petitions for Review of an Order of the
Board of Immigration Appeals.
No. A042-436-987

———————————

ARGUED SEPTEMBER 17, 2018 — DECIDED OCTOBER 25, 2018

———————————

Before EASTERBROOK, KANNE, and BRENNAN, *Circuit Judges*.

KANNE, *Circuit Judge*. In February 2016, the Department of Homeland Security commenced removal proceedings against William Yovanni Molina-Avila. He requested deferral of removal because he feared torture by Guatemalan gangs. The immigration judge denied the request for deferral, and the Board of Immigration Appeals denied the appeal. Months

later, Molina-Avila filed a motion to reopen the proceedings. The Board also denied that request. Molina-Avila has now petitioned for judicial review. Because the immigration judge's decision was supported by substantial evidence, we deny the petition for review of the denial of Molina-Avila's petition for deferral of removal.  And because the Board committed no legal error in its analysis, we deny the petition for review of the denial of the motion to reopen.

## I. BACKGROUND

William Yovanni Molina-Avila was born in Guatemala. In 1991, at the age of eleven, William came to the United States with his sister Monica and brother Edgar. William became a legal permanent resident the same year. As a young adult, he was convicted of three drug offenses under Illinois law. On February 2, 2016, the Department of Homeland Security initiated removal proceedings. William filed an application for deferral of removal under the Convention Against Torture ("CAT"), 8 C.F.R. § 1208.16(c). The application focused heavily on the treatment which William's brother, Edgar, experienced after returning to Guatemala.

Edgar was deported to Guatemala in 1998. Soon after his arrival, Edgar began experiencing violent harassment by a Guatemalan gang, the Mara 18. William believes the harassment occurred because Edgar was perceived as a wealthy former-American. The Mara 18 also targeted Edgar because he was tattooed with gang-related imagery.

The Mara 18 regularly extorted Edgar. When Edgar was unable to pay the "tax," he would be beaten, kidnapped, or forced to ingest alcohol and drugs. The Mara 18 regularly threatened Edgar's family, including William, with similar

treatment. Edgar's mistreatment continued for years, during which time he became depressed and began drinking heavily. He died from cirrhosis of the liver in 2012.

There are slight record inconsistencies regarding whether Edgar was extorted until his death. William testified that the gang never stopped extorting Edgar. Monica—Edgar's sister—testified that, towards the end of Edgar's life, the Mara 18 did not extort Edgar because he had no money and was very ill. Instead, Edgar's girlfriend paid on his behalf.

William and Monica both testified that Marisol Cordova—Edgar's former girlfriend—has experienced extortion after Edgar's death. That extortion included threats to harm Cordova or her children if she did not pay. No one, however, testified that Cordova or her children ever suffered physical harm.

There was also inconsistent testimony regarding whether Edgar sought help from Guatemalan police. William's statement indicates that, "on several occasions," Edgar unsuccessfully sought help or protection from the police. (R. 36-4 at 625.) William later testified that the police were of no help because "a lot of them are corrupt" and the remainder receive threats from the gang. (R. 36-3 at 472.)

Maria Rodriguez—William's former partner—suggested in her testimony that Edgar never contacted the police. She explained that "we were not able to understand why he was [not contacting the police] … until we came to understand that if he was to go to the police …, his life will be more in danger because the police work[] in conjunction with the gang." (R. 36-3 at 547.)

After Edgar's death, Ms. Rodriguez persuaded the Guatemalan police to conduct an investigation. The police department confirmed that no records of Edgar's mistreatment had ever been created. Officers briefly investigated Edgar's death, but quickly abandoned the effort.

During the removal proceedings, William explained why he feared mistreatment by the Mara 18 if returned to Guatemala. First, William referenced the threats the Mara 18 had made—to Edgar—about William. William also believed that, like Edgar, he would be perceived as wealthy. Finally, William feared that the Mara 18 would associate several of his tattoos with rival gangs. One tattoo, on his leg, contains imagery associated with the Spanish Cobras gang, which is active in Chicago, Illinois. William believed that another tattoo—which reads "Love MOM"—might be associated with the Mexican Mafia.

The immigration judge found that Molina-Avila was credible, but nevertheless denied his request for deferral. The immigration judge found that Molina-Avila's fears of torture were speculative and that there was insufficient evidence that government officials would acquiesce to any torture. On March 28, 2017, the Board denied the appeal on the same grounds.

Molina-Avila timely sought judicial review. On January 22, 2018, Molina-Avila's newly-appointed counsel filed a motion to reopen proceedings before the Board. In the motion, Molina-Avila argued that he received ineffective assistance of counsel when his original attorney chose not to request withholding of removal. The Board denied the motion. Molina-Avila now seeks review of both of the Board's decisions.

## II. ANALYSIS

We begin with the question whether the immigration judge and Board erred when they rejected Molina-Avila's argument that he would more likely than not be tortured if returned to Guatemala. We must also determine if the Board committed legal error in denying the motion to reopen.

### A. Substantial Evidence Supported the Denial of Molina-Avila's CAT Application

An applicant is eligible for withholding or deferral of removal pursuant to the CAT if the applicant can "establish that it is more likely than not that he or she would be tortured if removed." 8 C.F.R. § 1208.16(c)(2). To constitute torture, the act "must be specifically intended to inflict severe physical or mental pain or suffering." 8 C.F.R. § 1208.18(a)(5). The applicant must demonstrate that the torture was "inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." *Id.* at § 1208.18(a)(1). For a public official to acquiesce to torture, the official must "have awareness of such activity and thereafter breach his or her legal responsibility to intervene to prevent such activity." *Id.* at § 1208.18(a)(7).

"When the Board agrees with the decision of the immigration judge, adopts that decision and supplements that decision with its own reasoning, as it did here, we review the immigration judge's decision as supplemented by the Board." *Cece v. Holder*, 733 F.3d 662, 675 (7th Cir. 2013) (en banc). "We review the findings of fact for substantial evidence and reverse only if the evidence compels a different result." *Lozano-Zuniga v. Lynch*, 832 F.3d 822, 826 (7th Cir. 2016). "We review questions of law de novo, deferring to the Board's reasonable

interpretation set forth in precedential opinions interpreting the statute." *Id.* The substantial evidence standard is "extremely deferential and this court will not reverse simply because we would have decided the case differently, but rather only if the facts compel the opposite conclusion." *Id.*

### 1. Risk of Torture

William Molina-Avila identified several reasons why he feared torture if removed to Guatemala, almost all related to his brother's treatment. Specifically, Molina-Avila argued that the immigration judge improperly discounted the characteristics—outsider status, perceived wealth, and gang-related tattoos—which he shares with his brother. The immigration judge considered this evidence, but she ultimately concluded that his fears were hypothetical and generalized.

Molina-Avila initially argues that the immigration judge erred in focusing on whether he, specifically, would be targeted for torture. Molina-Avila believes he must only show that he is a "'member of a group that faces a high probability of [torture] in a foreign country.'" (Appellant's Br. at 14 (quoting *Velasquez-Banegas v. Lynch*, 846 F.3d 258, 261 (7th Cir. 2017)) (alteration in brief)). But that passage in *Velasquez-Banegas* dealt with an applicant's petition for withholding pursuant to 8 C.F.R. § 1208.16(b)(2). To obtain withholding under that provision, the applicant must show that it is more likely than not that he or she "would be persecuted on account of … membership in a particular social group." *Id.* In other words, membership in an identifiable group is an element of an application under § 1208.16(b)(2).

Molina-Avila's claim, however, is predicated on 8 C.F.R. § 1208.16(c)(2), which requires the applicant establish "that it

is more likely than not that *he or she* would be tortured if removed." (emphasis added). We have consistently specified that a petitioner under that section must proffer evidence "that *petitioner* will be tortured if he returns." *Rashiah v. Ashcroft*, 388 F.3d 1126, 1133 (7th Cir. 2004); *see also Ramos-Braga v. Sessions*, 900 F.3d 871, 882 (7th Cir. 2018); *Bernard v. Sessions*, 881 F.3d 1042, 1047 (7th Cir. 2018); *Oforji v. Ashcroft*, 354 F.3d 609, 615 (7th Cir. 2003) ("The language of the regulation unambiguously permits withholding of removal due to torture personally suffered by the alien….").

We do not suggest that evidence of torture of similarly situated individuals is irrelevant to a CAT petition for deferral. But the ultimate question is whether the evidence relied upon establishes that the petitioner will more likely than not be tortured if removed. Considered from that perspective, the record does not compel the conclusion that Molina-Avila would be tortured if removed.

Molina-Avila relies heavily on the threats the Mara 18 made to Edgar regarding William. The immigration judge found that these threats were "vague and not imminent," noting that Edgar had died "over three years ago." (R. 36-3 at 395.)

The immigration judge did not err in discounting the threats the Mara 18 conveyed to Edgar about William. These threats were not made to William and contained no specifics. They were made at indeterminate times prior to Edgar's death. Accordingly, at the time the immigration judge issued her decision, no threats had been made regarding William for at least three years. The immigration judge reasonably found that the threats were likely made but also that their existence was nondeterminative given their vagueness and remoteness.

There was minimal evidence that the Mara 18 would recognize William Molina-Avila as Edgar's brother, much less treat him identically, given the passage of time.

With respect to Molina-Avila's tattoos and perceived wealth, the immigration judge found that there was "insufficient evidence in the record regarding discrimination against or torture of those who have such tattoos in Guatemala or those arriving from the United States." (*Id.*)

Molina-Avila argues that further corroboration of his fears would be impossible to provide, and so the immigration judge erred when she required substantiation. *See Wani Site v. Holder*, 656 F.3d 590, 593 (7th Cir. 2011) (faulting the Board for requiring evidence which would have been impossible to provide). To begin with, the immigration judge did not err when she emphasized the lack of corroborating evidence despite finding Molina-Avila credible. "[U]nder the REAL ID Act, corroborating evidence may be required even if the applicant is credible." *Rapheal v. Mukasey*, 533 F.3d 521, 527 (7th Cir. 2008) (citing 8 U.S.C. § 1158(b)(1)(B)(ii)).

And we are not convinced that additional corroboration would have been impossible to procure. For example, Molina-Avila could have identified additional individuals with gang-related tattoos who were removed to Guatemala. If those individuals were mistreated by the Mara 18 or other Guatemalan gangs, Molina-Avila's fears of similar treatment would have been supported. But there was no such evidence proffered here. Molina-Avila cites several cases where we discussed whether membership in a gang or perceived wealth constitute "membership in a particular social group" sufficient to justify withholding pursuant to § 1208.16(b)(2). *See, e.g., Dominguez-Pulido v. Lynch*, 821 F.3d 837, 845 (7th Cir.),

*reh'g denied* (June 24, 2016). Those cases provide minimal guidance for our consideration of Molina-Avila's application pursuant to § 1208.16(c)(2).

Molina-Avila also faults the immigration judge for asserting that "Edgar's ex-girlfriend, ex-wife, and his two children have not faced harm since his death." (R. 36-3 at 395.) Molina-Avila correctly notes that multiple witnesses testified that Edgar's former girlfriend and her children have been extorted since his death. But the immigration judge focused on "harm" to Cordova and her children. There was no testimony that she had been physically assaulted. To constitute torture under the CAT, the act must cause "severe pain or suffering," and Molina-Avila has not explained how financial extortion—on its own—rises to that level. This testimony thus supported a finding that Molina-Avila might be extorted if returned to Guatemala but did not directly demonstrate that he would be tortured.

Thus, Molina-Avila relied on generalized evidence in arguing his tattoos and perceived wealth would inevitably result in torture. His brother possessed those characteristics and experienced torture, but the record does not compel the conclusion that all individuals with those traits will inevitably be tortured. In fact, the record indicates that Edgar's mistreatment began not immediately after his arrival in Guatemala, but when he began working as a bus driver. (R. 36-3 at 486; 36-4 at 632.) The most specific evidence which William relied upon was the Mara 18's indirect threats to him. But the threats were vague and occurred several years ago. The evidence does not compel the conclusion that Molina-Avila would more likely than not be tortured if removed.

2. *Government Acquiescence*

The immigration judge also found that Molina-Avila had not shown that he would be tortured with the acquiescence of Guatemalan officials. In challenging that conclusion, Molina-Avila relies upon the "evidence in the record that the Guatemalan government is ineffective in controlling the Mara 18." (Appellant's Br. at 19.) He contends that the Guatemalan police ignored Edgar's assault reports because of widespread corruption.

The immigration judge found that Edgar "never reported any incidents to the police." (R. 36-3 at 381.) William Molina-Avila argues, correctly, that his testimony contradicted that assertion in general terms. Monica Molina-Avila and Maria Rodriguez, however, both testified that Edgar never filed any police reports. And the Guatemalan police confirmed that they had no record of any reports. Given this equivocal evidence, the immigration judge did not err in concluding that Edgar never reported his assaults to the police.

And even if we assume that Edgar reported his assaults, substantial evidence supported the conclusion that the Guatemalan government would not acquiesce to any torture. In extreme cases, government indifference to widespread misconduct can constitute acquiescence. *See Sarhan v. Holder*, 658 F.3d 649, 657 (7th Cir. 2011) (finding that the Jordanian government's chronic refusal to make real efforts towards protecting women from honor killings constituted acquiescence under the CAT). In *Sarhan*, the court relied upon a well-developed record which contained a "substantial amount of information about honor killings in Jordan." *Id.* at 658. The record quantified the number of honor killings over the past decades,

discussed the government's "lackadaisical" response, and included the State Department's "condemnation" of the Jordanian government's inadequate efforts. *Id.* at 658–660. On the other hand, less detailed evidence regarding "gang problems"—and even "government official corruption"—does not compel a finding that the government has acquiesced in the gang violation. *Lozano-Zuniga*, 832 F.3d at 831 (finding that the applicant had not shown evidence of government collusion). This case is far closer to *Lozano-Zuniga* than *Sarhan*. The only undisputed instance in the record where a police report was made resulted in an (admittedly short) investigation. The record does not compel the conclusion that the police force is unwilling or unable to investigate gang violence.

### 3. *Possibility of Safe Relocation*

In reviewing a CAT application, the immigration judge should consider whether "the applicant could relocate to a part of the country of removal where he or she is not likely to be tortured." 8 C.F.R. § 1208.16(c)(3)(ii). Molina-Avila argues that he could not safely relocate within Guatemala because the Mara 18 is a national group and he would be required to live in hiding wherever he went.

"Relocating to another part of the country does not mean living in hiding." *Agbor v. Gonzales*, 487 F.3d 499, 505 (7th Cir. 2007). Molina-Avila cites cases where we found that safe relocation was impossible. *See Sarhan*, 658 F.3d at 661; *Ndonyi v. Mukasey*, 541 F.3d 702, 712 (7th Cir. 2008). In both cases, the country was too small for the petitioner to safely hide from the dangers justifying relief. Here, Molina-Avila identifies no record evidence which conclusively demonstrates that the Mara 18 controls all of Guatemala.

More importantly, Molina-Avila's application relies heavily on the threats made to his brother. But if the individuals who tortured Edgar never encounter William, he will not be recognized as Edgar's brother. Relocation would thus ameliorate one of the primary reasons he fears torture. William Molina-Avila argues that he would be required to live in hiding, but he does not adequately explain why. He references his tattoos, but most tattoos can be concealed. The evidence does not compel the conclusion that safe relocation within Guatemala would be impossible.

### B. The Board Committed No Legal Error when it Denied Molina-Avila's Motion to Reopen

Molina-Avila also challenges the Board's denial of his motion to reopen proceedings. Our jurisdiction to review the Board's decision is extremely limited. Generally, we lack "jurisdiction to review any final order of removal against an alien who is removable by reason of having committed" certain criminal offenses. 8 U.S.C. § 1252(a)(2)(C). *But see Wanjiru v. Holder*, 705 F.3d 258, 264 (7th Cir. 2013) (holding that an order denying deferral of removal under CAT is not a "final order" covered by § 1252(a)(2)(C)). That provision applies equally to appeal from denial of a motion to reopen. *Zamora-Mallari v. Mukasey*, 514 F.3d 679, 696 (7th Cir. 2008). However, "we do have authority to resolve any constitutional or other legal issues presented by the Board's handling of the motion to reopen." *Sanchez v. Sessions*, 894 F.3d 858, 862 (7th Cir. 2018) (citing 8 U.S.C. § 1252(a)(2)(D)). We can review to determine whether the Board used the "wrong legal standard" or failed to "exercise discretion or to consider factors acknowledged to be material." *Huang v. Mukasey*, 534 F.3d 618, 620 (7th Cir. 2008).

A petitioner may seek withholding of removal under CAT unless they have been "convicted of a particularly serious crime." 8 C.F.R. § 1208.16(d)(2). In that case, the petitioner is limited to seeking deferral of removal, which is much more easily terminated. 8 C.F.R. § 1208.17. Deferral and withholding claims are governed by the same elements and burden of proof. Molina-Avila originally petitioned only for deferral and did not dispute that his prior drug convictions were "particularly serious." When new counsel was appointed, Molina-Avila argued that his previous counsel was ineffective when they did not seek withholding.

Molina-Avila argues that the Board applied the wrong standard of review to his motion to reopen. He also argues that the Board erred in finding that he did not meet that standard. We clearly lack jurisdiction to consider the Board's conclusion that Molina-Avila has not identified evidence sufficient to show a *prima facie* entitlement to withholding. *See Huang*, 534 F.3d at 620 ("The facts that the Board finds, and the reasons that it gives, … cannot be reexamined by a court, whether for clear error [or] lack of substantial evidence….").

The question whether the Board applied the correct standard of review is more nuanced. The Board's decision addresses the standard of review in two sentences. First, the Board states that "[t]he evidence is insufficient to show prima facie that the respondent is more likely than not to suffer persecution in Guatemala on account of a protected ground." (R. 36-2 at 3.) In its concluding paragraph, the Board reiterates that "the respondent has not prima facie established his eligibility for relief." (*Id.* at 4)

Molina-Avila argues that the Board applied a "more likely than not" standard—which is what he would have to show to

prevail on the merits of a withholding claim—rather than requiring him to show a "reasonable likelihood" of success—the standard for prevailing on a motion to reopen proceedings. *See Boika v. Holder*, 727 F.3d 735, 742 (7th Cir. 2013) (holding that a *prima facie* case requires the petitioner to demonstrate a reasonable likelihood of success).

We are not convinced that the Board applied the incorrect standard of review, despite the ambiguous wording. The Board stated that Molina-Avila had not *prima facie* shown that he would more likely than not be persecuted in Guatemala based on a protected ground. That appears to be a restatement of the requirements of a withholding claim. In other words, the best reading of the Board's decision is that Molina-Avila did not "show prima facie that [he would prevail on his withholding claim]." (R. 36-2 at 3.) If the Board had meant to apply the "more likely than not" standard, the Board would have omitted "*prima facie*" from the sentence. The Board's emphasis that Molina-Avila had not made his *prima facie* case indicates that the correct standard of review was applied.

Molina-Avila argues that the Board applied the wrong standard because the substance of its analysis was inconsistent with the "reasonable likelihood" standard. But that argument is simply a cleverly-disguised attempt to challenge the sufficiency of the evidence supporting the Board's decision. We have no jurisdiction to conduct that analysis. *See Viracacha v. Mukasey*, 518 F.3d 511, 515 (7th Cir. 2008) (confirming that § 1252(a)(2)(D) permits review only of "pure questions of law," not mixed questions of law and fact). Molina-Avila relies on *Sanchez v. Sessions*, where we found that the Board applied the wrong standard to a motion to reopen. 894

F.3d 858, 863 (7th Cir. 2018). There, the Board was "not persuaded that the evidence offered … would have likely altered the outcome." *Id.* (quoting Administrative Record at 4). Unlike the present case, the Board did not focus on the petitioner's failure to make his *prima facie* case, and so it was manifestly clear that the wrong standard was applied.

Here the Board applied the correct standard of review. And the remainder of Molina-Avila's challenge would require us to consider the sufficiency of the evidence. Because we lack jurisdiction to review the Board's conclusion on its merits, we must deny the petition for review.

### III. CONCLUSION

The evidence relied on involved speculation, and so the immigration judge and Board did not err in denying the CAT petition for deferral. With respect to Molina-Avila's motion to reopen, the immigration judge committed no legal errors, and we lack jurisdiction to review the Board's weighing of the evidence.

For these reasons, we DENY the petitions for review.